WEATHERFORD, M. W. & N. W. RY. CO. v. CRUTCHER et al.

(Court of Civil Appeals of Texas. Austin. Nov. 15, 1911.)

1. MASTER AND SERVANT (§ 332*)—INJURY TO THIRD PERSONS—JURY QUESTION—SCOPE OF AUTHORITY.

Evidence, in an action against a railroad company for injuries from fright caused by the act of defendant's conductor in pulling down a trolley wire passing over the railroad tracks and causing it to be thrown against plaintiff's buggy, *held* to make it a jury question whether the pulling down of the trolley wire was in the scope of the conductor's authority.

[Ed. Note.—For other cases, see Master and Servant, Dec. Dig. § 332.*]

2. MASTER AND SERVANT (§ 302*)—SCOPE OF AUTHORITY — "AUTHORITY" — "INSTRUCTIONS."

The word "authority," as used in the rule that a master is only responsible for the acts of a servant within the scope of his authority, is not synonymous with "instructions," but often has a broader meaning.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 1217; Dec. Dig. § 302.*

For other definitions, see Words and Phrases, vol. 1, pp. 646–648; vol. 4, pp. 3663, 3664.]

3. MASTER AND SERVANT (§ 302*)—SCOPE OF AUTHORITY.

As a rule, a master is responsible for a servant's wrongful act if the servant had authority to do the business in which he was engaged when the act was committed, and it was done in the course of his employment, though the servant abused his authority, or was reckless, or inflicted unnecessary injury in performing his master's orders.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 1217; Dec. Dig. § 302.*]

4. DAMAGES (§ 20*)—REMOTE DAMAGES—PERSONAL INJURIES—INJURIES FROM FRIGHT.

As a rule damages may be recovered for physical injuries resulting from fright caused by a wrongful act if the fright is the natural and direct result of the wrongful act, though the wrongdoer did not anticipate the resulting injuries, so that plaintiff, who was severely frightened while driving near defendant's railroad track by its employés pulling down a trolley wire passing over the tram by means of fastening a chain to it and causing it to fall against plaintiff's buggy emitting sparks and frightening her horse, etc., could, as against an objection of remoteness, recover damages for the nervous shock and paralysis resulting from her intense fright, especially as it appeared that before defendant's conductor pulled down the wire plaintiff screamed and requested him not to pull it down, thereby notifying him that she was then frightened and apprehended injury from the wire being pulled down.

[Ed. Note.—For other cases, see Damages, Cent. Dig. §§ 55–57; Dec. Dig. § 20.*]

5. LIMITATION OF ACTIONS (§ 13*)—ESTOPPEL TO ASSERT.

In the original petition, in a personal injury action, filed within two years before the cause of action accrued, defendant was desig-

nated as the "M., etc., Railroad Company," and citation was issued running to that company and served upon defendant, the "W. M., etc., Railroad Company," and defendant appeared and moved to quash the citation because it did not command the sheriff to summon it by its proper corporate name, but designated itself in its motion as the defendant in the action, and the motion was sustained, and plaintiff filed an amended petition more than two years after the cause of action accrued, designating the defendant as the "W. & M., etc., Railroad Company." Held that, since defendant admitted in its motion to quash citation that it was the defendant sued, it was thereby estopped from afterwards claiming that it was not sued until the amended petition was filed.

[Ed. Note.—For other cases, see Limitation of Actions, Cent. Dig. §§ 56–58; Dec. Dig. § 13.*]

6. MASTER AND SERVANT (§ 329*)—INJURIES TO THIRD PERSONS—SUFFICIENCY OF PETITION.

The petition, in an action against a railroad company for injuries from fright caused by the act of the "employés in charge of the train" in throwing a chain over a trolley wire passing over the train and pulling the wire down by moving the train and throwing the wire against plaintiff's buggy, frightening her, was fatally defective in not alleging that the pulling down of the trolley wire was within the scope of the train employés' employment, or alleging facts showing that it was necessary in the scope of their employment, as that the wire was an obstruction to the operation of the train.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 1269; Dec. Dig. § 329.*]

Appeal from District Court, Palo Pinto County; W. J. Oxford, Judge.

Action by Mrs. Mattie Crutcher and another against the Weatherford, Mineral Wells & Northwestern Railway Company. From a judgment for plaintiffs, defendant appeals. Reversed and remanded.

H. C. Shropshire, for appellant. Capps, Cantey, Hanger & Short and Albert Stevenson, for appellees.

KEY, C. J. This is a personal injury suit brought by Mrs. Mattie Crutcher and her husband against appellant for injuries sustained by Mrs. Crutcher, which resulted in a verdict and judgment for the plaintiffs for $1,500, and the defendant has appealed.

The first assignment is addressed to the action of the court in refusing a requested instruction directing the jury to return a verdict for the defendant. Under that assignment, appellant urges two propositions, which are: First, that the act of appellant's servants in pulling down the trolley wire was not within the scope of the authority of said servants, and therefore appellant is not responsible for the act of its servants in that regard; and, second, that the damages claimed by appellees are too remote and speculative, and appellant or its servants were not required to foresee or anticipate the injuries which it is alleged Mrs. Crutcher sustained. The trial court submitted both of those questions to the jury, and required a finding in appellees' favor thereon in order for her to recover. The testimony relating to these two questions is set out as follows in appellant's brief:

"Mrs. Mattie Crutcher, for plaintiffs, testified: At the time of the injuries alleged I was residing in Mineral Wells, Tex., and was there engaged in the real estate business as an agent, and was driving out with a gentleman to show him a piece of property in Mineral Wells, going west on Hubbard street. When we had gotten within 25 feet of the railroad crossing on that street, there was a freight train standing at the crossing, and some one on the train was throwing something up over a trolley car wire, which also extends along that street east and west. The man attempting to do so was standing upon a box car which was about the center of the string of cars in the train. After he threw this something over the trolley, the man then signaled the engineer to pull out, and I then realized what they were attempting to do, but did not previously know, and had no notice of their intentions. The train, having started, pulled at the wire until it broke and went like a cannon and came towards me with a lightning flash, and the first I knew I was out of the buggy, but do not know how I got out, as I then began to tremble and shake and could not control myself. Mr. Sizer, a man in the buggy with me, also had got out. The trolley wire had been placed there by the street car people and was being operated at the time in question, and the man on the car was in the act of throwing the chain or rope over the wire just as I drove up there, intending to pass the crossing and continue along the street. I know I hollowed and screamed at him to let me go by, but he did not pay any attention to me. I did not realize what he was going to do. I saw that they were going to break the wire, and that if it hit me it would kill me, and I screamed at him to stop; but they went on pulling the wire down. When the wire broke, it fell or flew back toward me, and the whole street was in a blaze of fire, and when I saw it coming towards me I got dazed, and I did not know anything until I got out of the buggy on the ground. I do not know how near the broken wire came to me; it was on the ground when I saw it. At the time I was within 25 feet of the railway track, and between the first guy wire and the track of the railway which runs north and south across Hubbard street, which is east and west. Hubbard street is one of the main streets of Mineral Wells. When I saw that they were breaking the trolley wire, I then realized that there was danger, if they broke it. I then had no opportunity to get away. I know that at the time I screamed and hollowed I was not more than 20 or 25 feet from the men who

were throwing the chain over the wire. When I stopped there I had no idea they were going to break the wire, and did not know what they were doing and had no warning from the men on the train nor from any one else. Even after they started the train, I had no opportunity to get away with my horse and buggy, further than to get over to the sidewalk on the street where I was. The gentleman in the buggy had the chance to get the buggy from the middle of the street. I do not remember at all about getting out of the buggy, or whether or not some one pulled me out; but it relaxed me when I got on my feet. Just then they all got to work and got the wheels of my buggy and turned the buggy around. I think Mr. Sizer had hold of the horse, and when we stopped we were in front of the Imperial Hotel. After this I drove back to my rooms, to the house where I lived, and sent the horse and buggy back to the stable. Mr. Sizer and myself had started from the Beeler House after supper on the day of the accident and drove first to the post office. Returning towards Hubbard street, we then drove in the direction of the railroad crossing, a distance of a block and a half or two. blocks from the Turner drug store corner. When I first discovered what the trainmen were going to do, I was between the first guy wire and the Cogsdell gate east of the railroad track and was driving in a slow gait or in a walk. I was doing the driving; Mr. Sizer being on the south side of the buggy as we went west. The horse was gentle and would not scare at a train, and we drove up to within 20 or 25 feet of the train and was that close to it before I saw the train. We stopped immediately, as the train was at the time standing across the street crossing; the horse's head being not exceeding 25 feet from the crossing. The train was stopping as I drove up, or was stopping about the time I did. I did not turn around the street around the Oxford Hotel, either to the south or the north. I did not see the train as I turned into the corner at the Turner drug store, and not until I was a considerable distance down the street. I was not paying any particular attention to the train at any time, and did not see it until I was within 25 feet of it. I think it was too dark to have seen it much sooner than I did. I don't know how far I might have seen the train. The fact is I did not see it until I finally stopped the buggy as it was across the track. I could not have seen or distinguished a man any further than that. At the time I stopped my horse, I saw only two men, one of whom was on a box car of the train and the other on the engine, and the train was made up of one box car and two flat cars; one of the flat cars being next to the engine. The trolley wire runs east and west in the middle of Hubbard street, and the box car mentioned was right under the trolley. To the north of the box car there were the flat cars and engine; the engine fronting north. I saw no men there at all except the two on the train, and do not remember to have seen any at all on the ground. Only one man got off the car at the time, and he was the one that got the rope or chain that he threw over the trolley wire. I do not know where he got it, as he was in the act of throwing it over the wire when I stopped my buggy. As he did so, he was standing on top of the box car and almost immediately pulled the wire down after he had fastened the chain to something on one of the cars. This whole proceeding was not more than seven or eight minutes altogether, or might have been just a few minutes. The man who tied the chain over the wire was between me and the train when he gave the engineer the signal to start and was directly in front of me at the time. He said nothing either to me or to the man in the buggy with me, and we did nothing more than turn the horse from near the middle of the street over to the sidewalk. This was done by Mr. Sizer, the man in the buggy with me. There was no time to turn the horse and buggy and go back the other way before the wire broke, and it would have been dangerous to have done so after the breaking and falling of the wire. The wire broke about halfway from where we were standing in the buggy to the railroad track, and just after the break Mr. Sizer got out of the buggy to the ground. I did not know which way to go, and did not get out until after the wire was held down on the ground with something. There was at no time during all this proceeding that any one of the men at the train came to me and told me what they were preparing to do, and did not tell us to turn and go back, nor take my horse and lead it over to the sidewalk, and there was nothing said at any time about the horse being scary or not. At this time the broken wire was right at the wheels of the buggy on the ground.

"Ed Burdg, witness for appellant, testified: In 1907 I was working for the defendant company as conductor in charge of a construction train, laying steel on its extension north from Mineral Wells. I am not now employed. At the time of the accident in question I was coming into Mineral Wells from the work some miles north of the town, and at about dusk reached the street crossing on Hubbard street with my train, which consisted of the caboose, water car, and four or five flat cars. As we approached the crossing I was standing on top of the caboose in company with Irby Russell, a brakeman on the train. The train was backing into town and across Hubbard street crossing; the engine being to the north and the caboose to the south as we came into town. We had gone north out of Mineral Wells the night before this as was our custom, and during the day of the accident the street car

company had strung up and put up a trolley wire, running east and west across the railway track and along Hubbard street. On our return to Mineral Wells, at the time stated and while standing upon the caboose with Russell, and not knowing the presence of the wire, Russell and myself were both knocked down by coming in contact with it as the caboose reached the center of the street. After we managed to get up, I said to Russell that I was going to pull the trolley wire down. After getting down from the car, I went first to the west side of the street to see if there was any one coming that way, along the street, to tell them I was going to pull down the wire. There was no one on the street on the west side, and I then went to look up the street on the east side of the track, and some distance up the street I saw a lady and gentleman driving in the direction of the crossing in a buggy. I immediately ran up the street and told them I was going to pull the wire down, and asked him if their horse would scare. The lady in the buggy said the horse was all right. I told them that if the horse was scary they had better turn around the block, that I was going to pull down the trolley wire, and I then took the horse and led him over against the sidewalk on the north side of the street. They were then 170 feet from the railroad track and crossing. I then went immediately back to the train and got a chain and threw it over the wire; the whole matter so far having occurred within four or five minutes. The street at the time was blocked by the train at the crossing, but east of the track it was open and free of vehicles, other than that of plaintiff. As soon as I returned to the train I got a chain and threw it over the wire, attaching it to the trucks of the caboose, and then giving the engineer a signal to move the train. At this instance I had got on and was standing on the water car, and directed the engineer to start the train in a north direction. The train did not move more than five or six feet when the wire broke; the wire being pulled five or six feet to the north before it broke. West of the track there was a distance of some four or five feet to the first guy wire. The distance east of the track to the guy wire, where the trolley wire broke, was some 50 or 53 feet; the break occurring 4 or 5 feet east of the guy wire at that point. From that point east along the street there is a distance of 54 or 55 feet to the other guy wire, and the distance east along the street from that point to where the plaintiff's buggy was standing was 117 or 118 feet. Why did I pull that wire down? Because it liked to have killed me; that was the only reason. It made me good and mad, and that was exactly the reason I pulled it down. As conductor of this train laying steel on this extension, it was none of my duty and no part of my duty to pull down this wire. My duties were simply to run and operate the train for the purpose of laying the track. I was not authorized in any shape or form to pull down the wire in question, and it was no part of my duty in the operation of the train to pull it down. The wire as it was situated did not interfere with the operation of the train, and would have been no obstruction to me personally, if I had known it was there. At the time I was on top of the car.".

On cross-examination the same witness testified: "I have not been in the employment of the defendant company since four or five weeks after the accident in question. They fired me, but I do not know the exact reason of my discharge. I am not working at this time. My only purpose of taking hold of the plaintiff's horse, and in leading him from the middle of the street, was a matter of safety to get it from the middle of the street. I did not know where the wire might break, and they were at the time in the middle of the street and under the trolley wire. I did not know the wire was across the track, and did not know it was charged with electricity, and made no inquiries of any one as to whether it was or not. I just got mad and tore it down. This particular wire was no obstruction of the movements of the train. It would be a duty of a conductor to remove anything that would affect the operation of his train or stop its movements; that is, an obstruction on the track, if there merely for the purpose of an obstruction. August Wickland was the engineer on the train at the time in question. The brakeman, Irby Russell, who was on the caboose with me at the time, has since died. I do not know where the engineer Wickland is."

P. E. Bock, witness for defendant, testified: "I am vice president and superintendent of the defendant company. I know of the accident alleged, and also know the plaintiff Mrs. Crutcher. I have been connected with the railroad for a number of years, and at the time of the accident was at the place of it, and saw some of the matter talked about. As soon as I heard of the trouble, I went down the street to the railroad crossing, and east of the crossing I saw Mrs. Crutcher, and the man in the buggy with her, whom I did not know. When I first saw Mrs. Crutcher at that time she was on the sidewalk just north of a buggy that was standing in the street, and in front of the Blackburn House; the horse facing west. This point was 171 feet from the railroad track. To the first guy wire it is 54 feet. Taking the end of the broken wire and carrying it east as far as it would go on account of the first guy wire, the distance would be 51 feet, or 105 feet east of the railroad track, and the distance then on up the street from the point where the broken wire could be pulled, to the plaintiff's horse, would be 65 feet. I know Ed Burdg, the conductor of the train in question. His duties were simply to run

the train which was used for the purpose of extending the track north through the Keechi country. It was no part of his duties to break the wire in question, and he was not authorized by me to do so. The wire did not in any way interfere with the operation of the train at that point. It was the business and duty of Mr. Burdg to handle the cars and train only as he was instructed to do, and he had no other duties. As chief officer of the road I had charge of all the men and gave instructions in the work of the train and of the train crew. Burdg had no instructions from me to pull down the wire, and I had charge of him, and it was no part of his duty to do so. The wire as it was located and situated in no way interfered with the operation of the train." On cross-examination the same witness testified: "It is the duty of a conductor in charge of a train to remove any obstruction on the track that interferes with the running of his train, or that would endanger the safety of the men on the train. If there was a car on the track that interfered with the movement of the train, it would be the duty of the conductor to remove it for the performance of his work. If a rope was stretched across the track, maliciously, it would be the duty of the conductor to remove it for the movement of his train, and it was their duty to look out in such things as these, for the safety of the people on the train. It would be the duty of the conductor to remove a rock that obstructed the passage of his train, or that endangered the lives or safety of the people on the train. This trolley wire at the time and point in question was no obstruction to the movement of the train at that time. Men in charge of these trains, as well as of others, stand up or sit on top of the cars. There are no rules governing their conduct in that respect. They are at times compelled to be up. Q. Suppose he comes alone with a train and finds a tree that has blown down and the limbs of the tree are over the track, is it not the duty of the conductor to remove that obstruction and those limbs? A. Yes, sir; if he knew that it was, or that it endangered the safety of the train and the men, it would be his duty to remove it. Q. If he saw any obstruction that interfered with the running of the train, is it not his duty to remove it? A. Practically so, yes, sir, to run the train safely. Q. When you say that you mean for the safety of the employés or passengers on the train? A. Practically so; yes, sir. Q. One of the dangers to an employé on a train from any obstruction across the track would be to knock an employé off of the top of a box car? A. Yes, sir. Having authority to do so, I fired Burdg for the work he did in the pulling down of this wire. A man on a train of this kind is liable to be standing at any time on the top of a car, and such obstructions as have been mentioned would not in any way hinder the movements of the train, but might be to the men on the train. There was no authority of Mr. Burdg in this instance, and no instructions to him to break the wire in question. The wire had nothing to do with the movements of the train that Mr. Burdg was then running."

The witness W. Sizer, for plaintiff, testified: "I was in a buggy with Mrs. Crutcher at the time of the accident complained about. As a real estate agent, she was taking me west on Hubbard street to show me some city lots, and we got within 30 or 40 feet of the railroad which crosses Hubbard street, when we were stopped by two box cars which were then standing across the street on the track of the railroad. Mrs. Crutcher seemed to be a little excited and wanted to know what they were doing there. In a moment she gave some exclamation about a trolley wire, and in a moment after I saw that something was attached to the trolley wire, and we were right in the street under the wire, and that the wire was going to be pulled towards the buggy. I was pretty badly scared and kept under cover as much as possible under the buggy top. The horse plunged and got his feet on the sidewalk. I got loose about that time and saw a man holding the horse's head, and there were probably two men walking between the buggy and the road. I was pretty badly agitated, and was afraid to get out of the buggy on account of the wire and was afraid to stay in on account of the horse. No one came to the buggy to notify us they were going to pull the wire down. I know Conductor Burdg did not come there. I could not say that the wire fell close to where we were, nor how far away it fell. After the wire broke it made a considerable noise, and I think I dodged and tried to get out of the way or under the top of the buggy, and saw the wire flashing fire on the ground in two or three places along on the wire, probably a little in front and to the side of us, and it made a considerable noise when it struck the ground—a flash and report. I remember I was trying to protect myself and the lady as much as possible. I did get out of the buggy at some time, but do not think Mrs. Crutcher got out at all, and I did not get out until I saw some one passing between me and the wire along the street. I am not sure, and it may be that I saw Mrs. Crutcher on the ground at some time. We afterwards got back into the buggy and drove back to the hotel. At the time of this occurrence we were somewhere between 45 and 50 feet from the railroad, probably 30 feet."

Mrs. Mattie Crutcher, recalled for herself, testified: "Conductor Burdg did not come to the buggy and say to Mr. Sizer or myself they were going to pull the wire down; nor did he nor any one else, before the wire fell, take hold of the horse and lead him upon the sidewalk, nor did he speak to us, nor was he any nearer to us than the train."

[1] After careful consideration we have reached the conclusion that the peremptory instruction requested by appellant was properly refused, and that the evidence justified the court in submitting the case to the jury in the manner in which it was submitted.

[2] It is often said that the master is not responsible for the act of his servant or agent, unless the latter is acting within the scope of his authority. But the word "authority," when used in that connection, is not synonymous with "instructions," and very often has a much broader import. When a conductor is placed in charge of a railroad train, he has implied authority to do many things which his master may not desire to have done, and, although the master may specifically instruct him not to do a particular thing which comes within the scope of his general authority, yet if he disregards such instructions and does the prohibited thing, and a third person is injured as a result of such act, the railroad company will be responsible to such third person. In some instances such responsibility might not exist if it is made to appear that the plaintiff was aware of the fact that the master had instructed the servant not to do the act complained of; but, if such exception exists, this case does not come within it.

According to the testimony of Mr. Bock, who was appellant's vice president and superintendent, the conductor of the train, Mr. Burdg, who caused the trolley wire to be pulled down, had implied authority to remove any obstruction that would endanger the safety of passengers or employés on appellant's trains; and the testimony tends to show that the wire in question did jeopardize the safety of appellant's employés. It is true that, in order for it to have that effect, such employés would have to be standing upon the top of the cars when they passed under the trolley wire; but Mr. Bock testified that such employés do sometimes stand up or sit on the top of the cars, that there were no rules governing their conduct in this respect, and that at times they were compelled to do so. True it is, the conductor testified that the wire in question was no obstruction to the operation of that train, and that it was not his duty to pull it down, and that he did so because while standing on top of a car the wire had knocked him down and made him angry; but whether or not that was his sole motive, or he did so for the additional reason that he considered it necessary to remove the wire to prevent other employés of appellant from being struck and injured, was a question for the jury to determine. Besides, if the wire was so located as to endanger the safety of appellant's employés in operating trains, then it was an obstruction which, according to the testimony of Superintendent Bock, the conductor had authority from appellant to re-

move. And if he had such authority and exercised it, his motive in doing so was immaterial. In speaking of authority in this connection we are not to be understood as holding that the testimony shows that the conductor had the legal right, as against the owner of the trolley wire, to tear it down. In discussing the power or authority of an agent or servant we do not deal with the question of abstract or absolute right as against others to do a particular thing, but refer only to the scope of employment and to the extent the master intends that the agent or servant may act for and represent him.

[3] For a lucid and satisfactory discussion of the question now under consideration, see Robards v. Bannon Sewer Pipe Co., 130 Ky. 380, 113 S. W. 429, 18 L. R. A. (N. S.) 923, 132 Am. St. Rep. 394, decided by the Court of Appeals of Kentucky, and we quote as follows from the opinion in that case: "The question of the liability of the master for the acts of his servant depends altogether upon the fact whether or not the servant was acting within the scope of his employment. The terms 'course of employment' and 'scope of authority' are not susceptible of accurate definition. What acts are within the scope of the employment can be determined by no fixed rule; the authority from the master generally being gatherable from the surrounding circumstances. The master is liable only for the authorized acts of the servant, and the root of his liability for the servant's acts is his consent, express or implied, thereto. When the master is to be considered as having authorized the wrongful act of the servant, so as to make him liable for his misconduct, is the point of difficulty. Where authority is conferred to act for another without special limitation, it carries with it by implication authority to do all things necessary to its execution; and when it involves the exercise of the discretion of the servant, or the use of force towards or against another, the use of such discretion or force is a part of the thing authorized, and, when exercised, becomes, as to third persons, the discretion and act of the master, and this although the servant departed from the private instructions of the master, provided he was engaged at the time in doing his master's business, and was acting within the general scope of his employment. It is not the test of the master's liability for the wrongful act of the servant from which injury to a third person has resulted that he expressly authorized the particular act and conduct which occasioned it. In most cases where the master has been held liable for the negligent or tortious act of the servant, the servant acted, not only without express authority to do the wrong, but in violation of his duty to the master. It is in general sufficient to make the master responsible that he gave to the servant an authority or made it his duty to act in respect to

the business in which he was engaged when the wrong was committed, and that the act complained of was done in the course of his employment. The master in that case will be deemed to have consented to and authorized the act of the servant, and he will not be excused from liability, although the servant abused his authority, or was reckless in the performance of his duty, or inflicted an unnecessary injury in executing his master's orders. The master who puts the servant in a place of trust or responsibility, or commits to him the management of his business or the care of his property, is justly held responsible when the servant, through lack of judgment or discretion, or from infirmity of temper, or under the influence of passion aroused by the circumstances and the occasion, goes beyond the strict line of his duty or authority, and inflicts an unjustifiable injury upon another. Rounds v. Del. Lack. & West. R. R. Co., 64 N. Y. 129, 21 Am. Rep. 597. Furthermore, the law under such circumstances will not undertake to make any nice distinctions, fixing with precision the line that separates the act of the servant from the act of the individual. When there is doubt, it will be resolved against the master, upon the ground that he set in motion the servant who committed the wrong. South Covington & Cin. Street Ry. Co. v. Cleveland, 100 S. W. 283, 30 Ky. Law Rep. 1072, 11 L. R. A. (N. S.) 853; Thompson on Neg. §§ 554, 563; New Ellerslie Fishing Club v. Stewart, 123 Ky. 8, 93 S. W. 598 [29 Ky. Law Rep. 414], 9 L. R. A. (N. S.) 475."

[4] As to the second point urged under the first assignment, the law is well settled in this state that where physical injuries result from fright, caused by the wrongful act or omission of another, if such fright is the natural and direct result of the wrongful act, the wrongdoer cannot defend upon the ground that he was not required to anticipate the physical injuries caused by such fright. While the injuries which the plaintiff in this case claims to have sustained do not always result from fright, they frequently do; and a wrongdoer is required to anticipate such injuries as may naturally and directly result from a wrongful act. St. L. S. W. Ry. Co. v. Alexander, 141 S. W. 135, recently decided by this court. But in the case at bar the testimony shows that before the conductor pulled the wire down Mrs. Crutcher, the plaintiff, screamed and requested him not to pull it down, which was sufficient to put him on notice of the fact that she was already frightened, and apprehended that death, or other serious personal injury, might result to her if the wire was pulled down. Notwithstanding this notice, the conductor proceeded and caused the live wire to be pulled down, thereby increasing the plaintiff's fright; and he certainly ought to have contemplated that such would be the result, and that it might cause the plaintiff to suffer serious bodily injury. Of course, he could not foretell the exact nature and extent of such physical injury, nor was it necessary that he should be able to do so in order to fix liability for his wrongful conduct.

The second, third, and fourth assignments present, in different forms, the questions already discussed, and, for the reasons stated, those assignments are overruled.

[5] The fifth assignment complains of the action of the trial court in overruling appellant's special exception, which asserted that the plaintiffs' petition showed upon its face that the cause of action was barred by the statute of limitation, because it accrued more than two years before the commencement of the suit. The original petition was filed February 27, 1909, and alleged that the matters complained of occurred on the 16th or 17th of September, 1907. The defendant in that petition was designated as the "Mineral Wells & Northwestern Railroad Company," and a citation was issued commanding the sheriff to summon the Mineral Wells & Northwestern Railroad Company. That citation was served by the sheriff upon appellant, the Weatherford, Mineral Wells & Northwestern Railway Company. Appellant appeared and presented a written motion to quash the citation, among other reasons because it (the citation) did not command the sheriff to summon appellant, the Weatherford, Mineral Wells & Northwestern Railway Company. In that motion appellant designated itself as the defendant in the suit, and by doing so and filing its motion to quash the citation, we think it should be held as conceding the fact that the plaintiffs were suing it, but had incorrectly stated its name; and, having filed the motion to quash, it was required to answer at the next term of court, or permit judgment by default to go against it. York v. State, 73 Tex. 651, 11 S. W. 869. The court sustained the motion to quash the citation, and on January 22, 1910, the plaintiff filed an amended original petition, giving the name of the defendant as the Weatherford, Mineral Wells & Northwestern Railway Company. This was more than two years after the cause of action accrued, and appellant contends that this was the commencement of the suit as against it, and therefore its special exception pleading limitation should have been sustained. We think that contention would be correct if appellant had not filed the motion to quash the citation, in which motion it admitted that it was the defendant in the suit. The cause of action was not barred when the original petition was filed, and, appellant having in its motion to quash the citation admitted that it was the defendant therein sued, we think it is now estopped and precluded from asserting that it was not sued until the amended petition, stating its name correctly, was filed.

[6] The sixth assignment complains of the action of the trial court in overruling the defendant's general demurrer to the plaintiffs' petition, and that complaint rests upon the proposition that the petition failed to allege that the act of appellant's servants in pulling down and breaking the trolley wire in question was within the scope of their employment, and we sustain that assignment. That portion of the petition intended to show appellant's connection with the acts complained of reads as follows: "Plaintiffs would represent that on or about September 16 or 17, 1907, the plaintiff, Mattie Crutcher, who was then Mattie Anderson, and having since intermarried with C. L. Crutcher, was a resident of Mineral Wells, Tex., and on or about said date was driving to her home in said city at about dusk in the evening, and in order to reach her said home it was necessary for her to cross the track of said defendant at a public street crossing in said city on Hubbard street. That as she was proceeding along said Hubbard street to said crossing, and had just approached the crossing with the intent of getting over said track or tracks, a switch crew in the employ of defendant and operating an engine and tender, flat car, and box car belonging to said defendant, ran the same across said street, blocking the crossing and compelling the plaintiff to remain in her vehicle in said street, and while said train was so blocking said crossing, the said employés in charge of the same, and while standing on the top of the box car in said train, threw a heavy chain over a trolley belonging to a company operating an electric line of street railway in said city, and which said trolley wire was strung along said street and above the center of same and over the tracks of said defendant, and after they had hooked the chain which they had thrown over the trolley wire into the coupling of the cars, and said employés of said defendant started the engine, tearing down said trolley wire and causing the same to drop into the street near where the said plaintiff was seated in her vehicle, that the said trolley wire at the time the same was torn down was heavily charged with electricity, and when the said wire snapped it first jerked or jumped to the south side of the street opposite to where plaintiff was seated, and then snapped back across the street and struck the wheel of plaintiff's vehicle flashing fire, throwing sparks, hissing through the air, frightening plaintiff's horse, so that same attempted to run away, and all of which acts, the snapping and jerking of said wire, the flashing of fire from the same, and the frightening of the said horse, frightened the plaintiff, Mattie Crutcher, to such an extent that she began to shake like a leaf, sustained severe nervous shock and chill, her entire right side, limb, and arm became numb and paralyzed, so that she was only able to drag her limb and foot from her vehicle to her home. Plaintiffs would represent that, when the said Mrs. Crutcher realized that said employés of defendant were preparing to tear down the trolley, she called the said employés and requested them to wait until she could get out of the way, warning them of her danger, and which danger to her was also open, obvious, and apparent to said employés, had they exercised any care whatever; but notwithstanding the said warning, and notwithstanding the request of plaintiff to be allowed to get to a place of safety, and notwithstanding the danger apparent to plaintiff and any other person who might be in said street at said time, the said employés negligently, willfully, maliciously, and with utter disregard to plaintiff, her safety, or her rights, started said engine, tore down said trolley wire, and caused the injuries to plaintiff as above and hereinafter enumerated. Plaintiff would further represent that after said wire had been torn down and she was in a high state of nervous fright caused thereby, the employés of the defendant composing the switch crew got into a fight with a crew of the street railway company, whose wire they had torn down, and in the presence of plaintiff and the total disregard of her feelings, engaged in a free-for-all fight, cursed said street railway employés, and further frightened, humiliated, and injured plaintiff by their profane words, their cursing, abusing, and fighting in said public highway and in the presence of plaintiff."

Nowhere in these averments do the plaintiffs allege that the acts of appellant's servants that are complained of were within the scope of their employment or line of their duty, or done in obedience to appellant's order, and, unless they were such, appellant is not liable for such wrongful acts. And therefore we think it was necessary for the plaintiffs to allege that the acts referred to belonged to one of the classes for which the master is held responsible for the misconduct of his servant. In G., H. & S. A. Ry. Co. v. Henefy, 99 S. W. 884, the Court of Civil Appeals for the Fourth District, in a strong opinion by Mr. Justice Fly, held that a general demurrer to a petition should have been sustained because it omitted such allegations, and we quote as follows from the opinion in that case: "Appellant filed a general demurrer to the petition, which was overruled by the court, and that action is the subject of the fifth assignment of error. The office of a general demurrer is to test the legal sufficiency of a pleading to state a cause of action or to set up a ground of defense, and, if sufficient be stated to enable a court to see that there is a good cause of action or ground of defense, the pleading is proof against a general demurrer, however defective or insufficient it may be in its averments. It follows from that rule that every reason-

able intendment must be indulged in favor of a pleading attacked through a general demurrer. Applying these rules to the petition, what are the reasonable intendments that can and should be drawn from the allegations of the petition? It can be reasonably assumed from the petition that appellee as well as Lon Means, was in the employ of appellant; that they were engaged in working on a freight train; that appellee was acting within the scope of his duties; that Lon Means, without notice or warning, threw a large piece of ice off the train and struck appellee; and that Means was negligent in throwing the ice off the train. Would it be reasonable to indulge in the intendment that Lon Means was acting within the scope of his duties in throwing the ice off the train, and that his negligence was the negligence of appellant? Unless that can be done, the general demurrer was well taken, and should have been sustained. The law of respondeat superior is that the master is liable for the negligent acts of his servants if done in obedience to the master's order, or within the scope of their employment or line of their duty. To fix the liability of the master it must be alleged and proved that the servant was acting under the master's orders or within the scope of his (the servant's) employment, or on the line of his duty. What were the duties of the brakeman under the allegations of the petition? The only allegation is that he was 'a brakeman working on said train.' There is no key given as to what his work consisted of. Was it his duty to attend to the brakes, to attend the engine or caboose, or to load and unload trains? The pleading does not enlighten us. He may have been working on the train and yet have turned aside from his duties to throw a piece of ice off the train. Nothing can be gained of what the duties of the brakeman were from the fact that the ice is a useful article that is often carried on trains from point to point. The matter must be viewed as though a rock or a coupling pin or any other heavy substance had been thrown off the train. The scope of the employment of an employé cannot be deduced from the fact that he threw a useful article off the train at or near a station. We are left totally in the dark by the allegation as to whether it was the duty of the brakeman to cast ice off the train at stations, and, if so, whether he was in the discharge of that duty when the accident occurred. We do not think the case of Railway v. Pierce [7 Tex. Civ. App. 597], 25 S. W. 1052, affirmed by the Supreme Court (87 Tex. 144, 27 S. W. 60), is authority for upholding the petition in this case. In that case the negligence alleged consisted in the employment of an unskilled and incompetent servant, and there were facts alleged from which an implied authority to handle switches could be drawn from the allegations. The authority of the brakeman to throw ice off

141 S.W.—10

the train cannot be reasonably deduced from the allegations in this case. In that case it might be reasonably presumed that it was the duty of the brakeman to throw switches. In this case it cannot be presumed that it was the duty of a brakeman, any more than that of a fireman or engineer or conductor, to throw ice off. If any other employé on the train be substituted for the brakeman, the matter would be in the same shape. The act cannot be inferred to have been within the scope of the duties of a brakeman any more than within the scope of any other employé, and the very existence of that state of affairs destroys any implication that might be drawn from the allegations. The railway company was not liable for the acts of Lon Means unless he was acting within the scope of his employment, or along the line of his duty, and it should have been alleged that the act of the brakeman was chargeable to appellant. This allegation was just as necessary as it would be in cases where there can be fellow servants, to allege the responsibility of the master, and it has been often held that such allegation is necessary in that class of cases. Railway v. Harrington, 62 Tex. 597; Railway v. Dailey [110 Ind. 75] 10 N. E. 631; Laporte v. Cook [20 R. I. 261] 38 Atl. 700; Railway v. Johnson [102 Ind. 352] 26 N. E. 200; Di Marcho v. Builders' Iron Foundry [18 R. I. 514] 27 Atl. 328, 28 Atl. 661. As said in the case of Railway v. Anderson, 82 Tex. 516, 17 S. W. 1039 [27 Am. St. Rep. 902]: 'When a recovery is sought of the master for an injury inflicted by his servant, the plaintiff must show that the servant did the wrong while acting within the scope of his employment,' and if necessary to prove that fact, it must be necessary to allege it directly, or by implication at least. In that same case it was held that it could not be said that a brakeman had the implied authority to eject passengers, and how can it be held that he has the implied authority to throw chunks of ice off of trains? In the case of Railway Co. v. Yarbrough, 39 S. W. 1096, it appeared that an engineer sounded a whistle, merely to frighten plaintiff's horse, and the Court of Civil Appeals of the Fifth District said: 'The charge of the court is based on the theory that, if there was no occasion for the employés in charge of the engine to blow the whistle, and they blew it for the purpose of frightening plaintiff's horse, and not in discharge of duty, the railway company would be liable for damages resulting therefrom. This is not the law. If there was no occasion for blowing the whistle in furtherance of the master's business, and the act of the employé in causing the whistle to blow was solely for the purpose of frightening the horse of plaintiff, then the act cannot be said to have been done within the scope of his employment, so as to charge the master with its consequences. If the fireman had thrown a piece of coal at the horse to

frighten it, it might with equal consistency be claimed that the railway company was liable. If, however, the act was done in the discharge of his duties and in furtherance of the master's business, and was performed in a negligent manner, causing the injury, the master would be liable.' To the same effect is Railway v. Currie [100 Tex. 136] 96 S. W. 1073 [10 L. R. A. (N. S.) 367], recently decided by the Supreme Court of Texas. These authorities are cited to show that, although a man may be employed by a railroad company, still his employer is not responsible for all his acts, but that if he turns aside, even for a moment, from the performance of his duty, an act performed at that moment is not the act of his employer. Such being the case, an allegation that a person is working for a railway company, and that he was guilty of certain negligence, is not an allegation that he was acting in the line of his duty when he committed the act of negligence. The general demurrer to the petition should have been sustained."

It may be a matter of common knowledge that persons employed to act in certain designated and well-known capacities have certain implied authority, and that an allegation that a person was employed to and acted in such capacity would be equivalent to an allegation that he was authorized by the master to do certain things. For instance, if it be alleged that a certain person was employed and acting as conductor of a train, such averment may be equivalent to an allegation that he was authorized to act for the master in the general management and control of the train; but the averments of the plaintiffs' petition did not bring this case within such rule. The petition does not show that the trolley wire was so located as to constitute it an obstruction to the operation of appellant's trains. It is not alleged that it was so placed as that it would come in contact with a man standing on top of a passing car; nor is it alleged that in pulling it down appellant's employés were acting in furtherance of appellant's business, or under its direction to pull the wire down. If the petition had alleged facts showing that the wire in question was an obstruction to the operation of appellant's trains, and therefore a necessity existed for its removal, it may be that it should be held, as matter of law, that the conductor had implied authority from appellant to remove it, and that it was not necessary to allege the existence of such authority. However, that question is not involved in this case, and we make no authoritative ruling thereon.

For the error committed in not sustaining the general demurrer to the plaintiffs' petition, the judgment is reversed, and the cause remanded.

Reversed and remanded.