ACME LAUNDRY v. WEINSTEIN. *
(No. 8281.)

(Court of Civil Appeals of Texas. Ft. Worth. Nov. 27, 1915. Rehearing Denied Jan. 15, 1916.)

1. MASTER AND SERVANT ⟷302 — LIABILITY FOR SERVANT'S TORTS.

While a principal is liable for the consequences of acts expressly directed and authorized by him, though performed by an agent or servant, and is charged with the responsibility therefor to the same extent as if such acts had been performed by him in person, his responsibility is not limited to acts performed by himself or by an agent under his express authority, and the important inquiry is not whether the agent was authorized to do, or omit to do, the act the doing or omission of which constitutes negligence, or whether it was done or omitted in violation of instructions, but whether it was done or omitted by the agent in the course of his employment and while he was engaged in the business of his principal.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1217–1221, 1225, 1229; Dec. Dig. ⟷302.]

2. MASTER AND SERVANT ⟷330—LIABILITY FOR SERVANT'S TORTS.

When a recovery is sought of a master for an injury inflicted by a servant, plaintiff must show that the servant did the wrong while acting within the scope of his employment.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1270–1272; Dec. Dig. ⟷330.]

3. MASTER AND SERVANT ⟷302—LIABILITY FOR SERVANT'S TORTS—"COURSE OF EMPLOYMENT."

A servant is acting within the "course of his employment" when he is engaged in doing for his master either the act consciously and specifically directed, or any act which can fairly and reasonably be deemed to be an ordinary and natural incident or attribute of that act, or a natural, direct, and logical result of it; and the test is not whether the act was done while the servant was in the place appointed for the service, or during the time in which he was engaged in such performance, but whether it was a natural and not a disconnected or extraordinary part or incident of the service contemplated.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1217–1221, 1225, 1229; Dec. Dig. ⟷302.

For other definitions, see Words and Phrases, First and Second Series, Course of Employment.]

4. MASTER AND SERVANT ⟷305—LIABILITY FOR SERVANT'S TORTS.

That a negligent act of a servant resulting in an injury may not have been authorized by the principal, or may have been forbidden, will not necessarily relieve the master or principal from liability.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1223, 1224; Dec. Dig. ⟷305.]

5. MASTER AND SERVANT ⟷330—INJURIES TO THIRD PERSONS—SUFFICIENCY OF EVIDENCE.

In an action for injuries to a boy struck by a barrel thrown into an alley from the window of a laundry in removing rubbish from a room in which supplies were kept, evidence *held* to support a finding that the foreman of the washroom and an employé working under his authority were acting within the scope of their employment, though it was claimed that the work was being performed after the completion of their regular duties for the day, and that there was a janitor whose special duty it was to clean up the building and each room thereof.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1270–1272; Dec. Dig. ⟷330.]

6. MASTER AND SERVANT ⟷302—LIABILITY FOR SERVANT'S TORTS.

Where it was one of the duties of the foreman of the washroom of a laundry to go to a room where supplies were kept for necessary supplies, it was within the scope of his employment for him to remove rubbish from such room, in order that he might more conveniently and efficiently perform the service specially delegated to him, though the removal thereof was not specially authorized; it being a natural

incident to and growing out of the particular service delegated to him.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1217–1221, 1225, 1229; Dec. Dig. ☞302.]

**7. MASTER AND SERVANT ☞302—LIABILITY FOR SERVANT'S TORTS.**

To render a master liable for the act of a servant, it must be done within the scope of the servant's general authority in the furtherance of the master's business and for the accomplishment of the object for which the servant is employed.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1217–1221, 1225, 1229; Dec. Dig. ☞302.]

**8. DAMAGES ☞186—LOSS OF SERVICES—SUFFICIENCY OF EVIDENCE.**

In a father's action for the loss of his minor son's services because of injuries necessitating the removal of a kidney, evidence *held* to sustain a finding that plaintiff's minor son was, by the injury complained of, rendered incapable of performing manual labor, or that his capacity to so perform such labor had been greatly impaired, irrespective of whether the loss of a kidney would, in all cases, impair the ability of one to labor or earn money.

[Ed. Note.—For other cases, see Damages, Cent. Dig. § 509; Dec. Dig. ☞186.]

Appeal from District Court, Tarrant County; Marvin H. Brown, Judge.

Action by E. Weinstein against the Acme Laundry. Judgment for plaintiff, and defendant appeals. Affirmed.

John W. Wray, of Ft. Worth, for appellant. McLean, Scott & McLean, of Ft. Worth, for appellee.

BUCK, J: Sol Weinstein, son of appellee, nine years old, while going from school to his home, in passing through an alley at the rear of appellant's building, was seriously and permanently injured by a barrel, which was thrown from an upper story window of appellant's building, coming in contact with his body. The injury was of such a nature as necessitated a surgical operation by which the right kidney of the boy was removed. He was in the hospital for several weeks, and after being removed to the home of his parents was confined to his bed for some time. Plaintiff alleged, and the evidence tends to support such allegations, that the injury had affected the boy seriously, both in mind and body, from which he had not recovered at the time of the trial, about four years after the accident. It was alleged that the injury was caused by the negligence of the defendant company, a corporation, and its employés; that the barrel which caused the injury was thrown from the window by C. R. Crawford and Floyd Bingham, employés of the defendant at the time, in the course of their employment with appellant, and while they were doing work within the scope of their employment; that the place where the boy was injured was on a public thoroughfare, constantly used by pedestrians and persons in vehicles. It was further alleged that plaintiff had expended four hundred dollars in medical and hospital bills necessarily incurred, and which was alleged to be the reasonable value for such services. Plaintiff further alleged that he had been damaged by reason of the impaired ability of the boy to render his parents service and labor while a minor, and asked judgment for both said expenditures and said loss of service. Defendant answered by a general demurrer and general denial. C. R. Crawford was foreman of the washroom of the laundry, while Bingham was an employé working under Crawford's authority. On the occasion of the injury, after he had finished the performance of his regular duties of foreman of his department, he concluded to go up stairs and clean out the room where supplies were kept, and instructed Bingham to go with him to assist him. There were in said room empty barrels and boxes, and other refuse material, which Crawford concluded ought to be removed, as testified to by him, because the rubbish was in his way. The two collected the rubbish and pitched it out of the window and, as the last barrel was pitched out, the little boy, coming from school, passed along the street or alley and was hit and injured, as before set out. The main controversy between plaintiff and defendant is as to whether or not Crawford and Bingham were, at the time of the accident, acting within the scope of their authority under their employment with the laundry, inasmuch as there was a janitor whose special duty it was to clean up the building and each room thereof, and no special authority or instruction had been given to either Crawford or Bingham to do this work, and the work was performed after the completion of the regular duties of each for the day.

The cause was submitted to the jury on special issues, which the jury answered and found as follows: First, that Crawford was acting within the scope of his employment at the time the barrel was thrown out of the window; second, that Bingham was also so acting at said time; third, that the throwing out of the window of the barrel was negligence; fourth, that such negligence was the proximate cause of the injury complained of; fifth, that the damages sustained by plaintiff amounted to $1,400. Upon this verdict the court rendered judgment for plaintiff for said $1,400, from which the defendant appeals.

The court instructed the jury that, if they found and believed from a preponderance of the evidence that at the time Crawford and Bingham went into the stockroom and threw the barrel out of the window, the day's work for which Crawford and Bingham were employed to perform had been done, and Crawford and Bingham had the right to leave the defendant's establishment, but voluntarily remained therein, and voluntarily undertook to do the work of cleaning out the stockroom, they would answer issues 1 and 2 in the negative. Appellant's first assignment is directed

to the refusal of the court to give a peremptory instruction in its favor, and its second, third, fourth, fifth, and sixth attack the finding of the jury in answer to issues 1 and 2. Its seventh assignment is leveled at the verdict of the jury as to the measure of damages. Since it is practically admitted by appellant that the throwing out of the barrel under the circumstances was negligence on the part of Crawford and Bingham, we need only to consider, with reference to the first six assignments, the question of whether or not the employer was liable for such negligent acts, and whether or not said employés, while attempting to clean up the stockroom, were acting within the scope of their employment.

[1] While the principal is liable for the consequences of the acts expressly directed and authorized by him, though performed by an agent or servant, and is charged with the responsibility therefor to the same extent as if such acts had been performed by such principal in person, yet his responsibility is not limited to those acts performed by the principal himself or by an agent under his express authority. As is said by Mechem on Agency, vol. 2, § 1874:

"In determining the principal's liability for the agent's negligence, the important inquiry is, not whether the agent was authorized to do, or omit to do, the act, the doing or not doing of which constitutes the negligence complained of, or whether the act was done or omitted in violation of the principal's instructions, but whether the act was done or omitted by the agent in the course of the employment, and while he was engaged in the business of his principal. In endeavoring to state a rule for such cases, it was said by a learned judge: 'In most cases where the master had been held liable for the negligence of his servant, not only was there an absence of authority to commit the wrong, but it was committed in violation of the duty which the servant owed the master. The principal is bound by a contract made in his name by an agent only when the agent has actual or apparent authority to make it; but the liability of a master for the tort of his servant does not depend primarily upon the possession of an authority to commit it. The question is not solved by comparing the act with the authority. It is sufficient to make the master responsible civiliter if the wrongful act of the servant was committed in the business of the master, and within the scope of his employment, and this, although the servant, in doing it, departed from the instructions of his master.' This rule is well founded upon public policy and convenience. Every person is bound to use due care in the conduct of his business. If the business is committed to an agent or servant, the obligation is not changed. The omission of such care is the omission of the principal, and for injury resulting therefrom to others, the principal is justly held liable. If he employs incompetent or untrustworthy agents, it is his fault; and whether the injury to third persons is caused by the negligence or positive misfeasance of the agent, the maxim respondeat superior applies, provided, only, that the agent was acting at the time for the principal and within the scope of the business intrusted to him."

Quoting further from the same authority (section 1875):

"Nevertheless, the liability of the master in these cases is based upon the general principles of agency, and cannot otherwise exist. It is simply another aspect of the question of authority, with its incidents, which was discussed in a preceding section. There is no rule of public policy or convenience that a master shall be liable for all the acts or defaults of his servants. For what acts or defaults is he liable? For those and those only for which he can in some way fairly be deemed to be responsible. He directed the doing of a given act; that very act was negligently done, but it is within the ordinary range of human experience that that may happen. He directed the doing of a given act; the servant did also some other act which was a natural incident or attribute of the main act or a natural and proximate consequence of it; to do that additional act at all was negligence, or it was negligently done. This also is within the ordinary range of human conduct. It is possible, therefore, in these cases to see some direct relation between the authority and the act complained of —to trace some natural and direct causal connection between the authority and the act."

[2] As said in the case of Railway v. Anderson, 82 Tex. 516, 17 S. W. 1039, 27 Am. St. Rep. 902:

"When a recovery is sought of the master for an injury inflicted by his servant, the plaintiff must show that the servant did the wrong while acting within the scope of his employment."

In the case of Railway v. Yarbrough, 39 S. W. 1096, it appeared that an engineer sounded a whistle merely to frighten plaintiff's horse, and the Court of Civil Appeals for the Fifth District said that:

"The charge of the court is based upon the theory that, if there was no occasion for the employés in charge of the engine to blow the whistle, and they blew it for the purpose of frightening plaintiff's horse, and not in discharge of duty, the railway company would be liable for damages resulting therefrom. This is not the law. If there was no occasion for blowing the whistle in furtherance of the master's business, and the act of the employé in causing the whistle to blow was solely for the purpose of frightening the horse of plaintiff, then the act cannot be said to have been done within the scope of his employment, so as to charge the master with its consequences." Railway Co. v. Crutcher, 141 S. W. 137.

[3] What is meant by "course of employment" as used in this connection? In the words of Mr. Mechem, § 1879 et seq.:

"Since no act can be completely isolated from its surroundings, since every act must have its penumbra of incident and attribute, it is essential that some term shall be found which shall include, not merely the act itself, but this train of attendant circumstances. For the lack of a better term, it is said that in order to charge the master with the servant's negligence, the servant must be acting in the 'course of his undertaking' or 'within the course of his employment.' This term 'course of his employment,' like the corresponding term 'the scope of the authority' in cases of agency, and 'the scope of the business' in cases of partnership, is one not capable of precise definition, although many attempts have been made to define it. It is largely a question of fact, and its determination may vary in each case in view of the particular circumstances. The utmost that can ordinarily be said is that a servant is acting within the course of his employment when he is engaged in doing, for his master, either the act consciously and specifically directed, or any act which can fairly and reasonably be deemed to be an ordinary and natural incident or attribute of the act or a natural, direct, and logical result of it. If in doing such

an act, the servant acts negligently, that is negligence within the course of his employment. As has already been pointed out, the question of what acts can be deemed to be done within the course of the employment is not merely a question of time or place. Not every act which an agent or servant may do while he is in the place appointed for the service, or during the time in which he is engaged in the performance, can be deemed to be within the course of the employment, or within the scope of the authority. The test lies deeper than that; it inheres in the relation which the act done bears to the employment. The act cannot be deemed to be within the course of the employment, unless, upon looking at it, it can fairly be said to be a natural, not disconnected and not extraordinary, part or incident of the service contemplated. A servant who, while driving his master's team upon the master's business and holding the reins in one hand, amuses himself by striking people, within reach, with the whip, which he holds in the other hand, does so while he is acting generally for his master and while he is in the place in which his service requires him to be, but his act in striking people with the whip is not within the course of his employment, and his master is not liable for it."

[4] But, on the other hand, it is equally true that the fact that the negligent act resulting in the injury may not have been authorized by the principal, or in fact may have been forbidden, will not therefore necessarily relieve the master or principal from liability. In Railway Co. v. Derby, 14 How. 468, 14 L. Ed. 502, the United States Supreme Court held that, where a railway engineer, who was running a train at a time when he had been expressly forbidden to do so, and collided with a special train containing the plaintiff, and thereby injured him, the railway company was liable, and, further, it was held in Cosgrove v. Ogden, 49 N. Y. 255, 10 Am. Rep. 361, that where the agent of a lumber dealer, in order to promote his convenience in handling it, caused lumber to be piled in a place where his principal had instructed him not to have it piled, and the lumber, being negligently piled, fell upon and injured the plaintiff, the principal was liable. In Garretzen v. Duenckel, 50 Mo. 104, 11 Am. Rep. 405, where a salesman in a gun store, who had been expressly instructed not to load guns in the store, loaded one for the purpose of demonstrating it to a customer, who refused to buy unless this was done, and the gun, going off, accidentally shot plaintiff, it was held that the employer was liable. See also Railway v. Rodgers, 89 Tex. 675, 36 S. W. 243; Cook v. Nav. Co., 76 Tex. 353, 13 S. W. 475, 18 Am. St. Rep. 52.

[5] But we think the evidence is sufficient to sustain the jury's findings to which complaint is made. Crawford testified, in part, as follows:

"I was in the employment of the Acme Laundry as foreman; it was my duty to see that things were kept in shape, and I taken it on myself. I went to the storeroom to bring down some supplies for the washroom, perhaps, and at that time there was quite a few barrels, empty boxes, and rubbish in my way, and I decided, while I was up there, I would get one of the boys and make a little cleaning up. Well, to make things short, I just gathered the things up,

and we put it out this second floor window, looking between every piece that went out—looking between the times; and as we taken the last barrel we were to put out, there was a couple of boxes and things to be moved between it, it taken a little more time, so when we threw it out I heard some peculiar kind of a noise, and I looked down and saw this last barrel had struck the boy. * * * It was my duty, in connection with my washing, to go upstairs and get the soda and things to use in the washing. * * * What caused me to clean up the room was there was two weeks of rubbish. boxes, and empty barrels, or about a week's rubbish; that rubbish consisted of about four or five barrels and some little white pine boxes that were knocked to pieces. Floyd Bingham assisted me in throwing that barrel out of the window. He was a wringer employed under me in the washroom, wringing shirts for me at that time. * * * To get around those boxes and barrels I could have got between them without putting it out, but I felt it was my duty, that the trash was there—to move it and get it clear out of the way. There were two keys to that room at the time of the injury; I had one of the keys. * * * They did not have any other room except the one I went to in which they kept these substances for washing clothes. I had been head washman for two or three years. I had the care of that particular room something like about two or three years, I suppose. I had carried the key to that room about two years before the injury. * * * It was part of my duties as head washer to get the material and supplies in to other boys. * * * This young man Bingham who was helping me, he did what I told him to do; so did the janitor."

Bingham testified, in part, as follows:
"I acted under Crawford's orders. Mr. Wheeler placed me under him. Mr. Wheeler was the proprietor of the laundry. * * * When I went to work at the laundry Mr. Wheeler instructed me to do what Crawford said."

[6, 7] From the testimony quoted it appears: First, that Crawford in the position he occupied had been charged with duties involving discretion; second, that in removing the rubbish from this room he was doing so, as he thought, in furtherance of his employer's business; third, that he had at least a limited charge and control of said room; and, fourth, that in removing the rubbish he was performing a service conducive to his convenience as such head washman in the discharge of the duties devolving upon said position. For, as it was his duty to go to this room for the supplies needed, and such act was plainly within the scope of his employment, it can hardly be said with reason as to the attempt to remove the rubbish in order that he might more conveniently or efficiently perform the service specially delegated to him, that his former act, though not specially authorized, was not a natural incident to and growing out of the particular service delegated to him. To render the master liable for the act of a servant, it must be done within the scope of the general authority of the servant, in the furtherance of the master's business, and for the accomplishment of the object for which the servant is employed. I. & G. N. Ry. v. Anderson, 82 Tex. 516, 17 S. W. 1039, 27 Am. St. Rep. 902; 6 Labatt's Master and Servant, § 2277.

The language used by the author in the section last cited is as follows:

"It is well settled that if the act complained of was incidental to the discharge of the functions covered by the servant's general authority, the master cannot avoid liability on any of the following grounds: That he did not specifically authorize the commission of that particular act; that he had no knowledge of it; or that it involved the abuse or excess of authority conferred upon him." Higgins v. Railway Co., 46 N. Y. 23, 7 Am. Rep. 293; Robards v. Sewer Pipe Co., 130 Ky. 380, 113 S. W. 429, 18 L. R. A. (N. S.) 923, 132 Am. St. Rep. 394; Oil Co. v. Parkinson, 152 Fed. 681, 82 C. C. A. 29; Hardeman v. Williams, 169 Ala. 50, 53 South. 794; T. & P. Ry. Co. v. Hayden, 6 Tex. Civ. App. 745, 26 S. W. 331.

In the case of Higgins v. Railway Co., supra, the court uses the following language:

"The master's liability for the negligence or tort of his servant does not depend upon the existence of an authority to do the particular act from which the injury resulted. In most cases where the master has been held liable for the negligence of his servant not only was there an absence of authority to commit the wrong, but it was committed in violation of the duty which the servant owed to the master."

Therefore, we are of opinion that assignments 1 to 6, inclusive, must be overruled.

[8] The seventh assignment is as follows:

"The verdict of the jury as to the measure of damages is wholly unsupported by the testimony, and a new trial should be had: First, because there was no testimony, expert or otherwise, that would inform the jury of the effect the loss of the kidney would have on the boy's physical condition and his ability to perform his ordinary duties to his father; second, because the mere fact of the loss of a kidney was not sufficient for the jury to infer that it would impair, in any manner or way, the physical or mental ability of the boy to perform his ordinary duties to the plaintiff; third, because it was incumbent upon the plaintiff to establish to the jury that the loss of a kidney would impair the physical ability of the boy to perform his ordinary duties that he would most probably have performed to the plaintiff; fourth, because there was no testimony that disclosed that the loss of a kidney would in any way impair or lessen the boy's earning capacity."

The plaintiff testified in part as follows:

"I am engaged in the mercantile business in Ft. Worth at 105 Houston street, hardware business. * * * I was out about $400 for hospital and doctor's bills. Just before the time my boy got hurt he was a solid child and never was sick a minute. Since his injury he has not been able to do any work or help me in the store any at all. He cannot do nothing. Whenever I tell him to sweep out the store or pick up a few nails from the floor he cannot do it; he cannot bend himself. He insists that he cannot. His condition in the last two years is one day well and the next day he is sickly, and the third day he is sick entirely, and we keep him always under the doctor and doctor him at home. I have had Dr. Furman with him also at my home. And he treats him many times at home at nights, and daytimes sometimes we take him to the office. In the business I am engaged in I can use a boy from 10 to 21 years of age to assist me, but not that boy. A boy in my business there could do everything in a hardware store—handle nails, handle hinges, sell hinges, buy hinges, sweep the store, move one thing and another. A hardware store has got to be clean every minute; move things from one place to another every minute. * * * Before he was hurt he had been of assistance to me in the store. He used to come in and help me, and he used to come every time after school to help me carry in the show that we have to show people outside, and in the morning he used to come to help me carry out the show, and now I have to do that myself or hire it done. For the last few years since the injury, the boy has not done a thing in the way of work around the store."

Irrespective of whether or not the loss of a kidney would, in all cases, impair the ability of one to labor or earn money, the evidence quoted is sufficient to sustain a finding that in the present case the plaintiff's minor son was, by the injury complained of, rendered either incapable of performing any manual labor, or, at least, that his capacity to so perform manual labor has been greatly impaired. For such loss of service on the part of his minor son the jury has awarded the plaintiff $1,000, if we subtract from the total amount the $400 which the uncontradicted testimony shows was incurred in the way of medical treatment and hospital fees. And while the precise question is not raised in the assignment, and therefore we do not have to decide it, yet it has been held that, in the absence of testimony, expert or otherwise, as to the reasonable value of services, the loss of which is asserted as an element of damages, the jury, who are in full possession of all the details of the entire transaction, may find the value upon their own judgment, provided there be enough in the evidence as to the character of the services to enable them to judge. Hall & Co. v. Immigration Association, 53 Tex. Civ. App. 592, 116 S. W. 831. And upon an analogous proposition might be cited the case of Railway v. Harris, 172 S. W. 1129. The seventh assignment is overruled.

The judgment of the trial court is, in all things, affirmed.