PALATINE INS. CO. et al. v. GRIFFIN. (No. 1105.)

(Court of Civil Appeals of Texas. Amarillo. March 6, 1918. Rehearing Denied April 24, 1918.)

1. CONSPIRACY ⟨key⟩1—ELEMENTS—DEFINITION.

A conspiracy is a combination of two or more persons by some concerted action to accomplish some criminal or unlawful purpose, or to accomplish some purpose not in itself criminal or unlawful by criminal or unlawful means.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Conspiracy.]

2. TORTS ⟨key⟩10—INTERFERENCE WITH BUSINESS—LIABILITY.

One who without justification of acting in the exercise of any right of his own interferes with the freedom of another in his employment of the agencies of his business is liable for the injuries resulting.

3. CONSPIRACY ⟨key⟩8—COMBINATIONS—REFUSAL TO GRANT INSURANCE.

If fire insurance companies combine in refusing to grant insurance, and also in persuading other companies to refuse insurance by unlawful means, the combination is unlawful.

4. MONOPOLIES ⟨key⟩18 — AGREEMENT IN RESTRAINT OF TRADE—INSURANCE—"COMMODITY."

Under Rev. St. 1911, art. 7798, subd. 1, making an agreement to refuse to buy from or sell to any other person any article of merchandise, produce, or commodity, the agreement between insurance companies to refuse insurance to an applicant is not prohibited, since insurance is not a commodity within the act.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Commodity.]

5. MONOPOLIES ⟨key⟩18 — AGREEMENT IN RESTRAINT OF TRADE—INSURANCE.

Rev. St. 1911, art. 7796, subd. 5, making illegal a combination or agreement to preclude a free and unrestricted competition in the business of insurance, and subdivision 6, making unlawful a combination to regulate the amount of insurance which may be undertaken, does not apply to an agreement between insurance companies to refuse to write fire insurance for a certain person; the purpose of the act being to promote competition.

6. CONSPIRACY ⟨key⟩13 — INDIVIDUAL LIABILITY.

A conspiracy makes the individual parties to it liable not only for their own individual acts, but for the acts of others done in the accomplishment of its purpose.

7. INSURANCE ⟨key⟩577 — INSURER'S LIABILITY FOR ACT OF ADJUSTER—CONSPIRACY.

Where a fire insurance adjuster, without authority to contract for insurance, agreed to enter into conspiracy with other insurance companies to prevent an individual from obtaining insurance, his act did not bind his principal, since it was not within the scope of his employment.

8. INSURANCE ⟨key⟩577 — INSURER'S LIABILITY FOR ACT OF ADJUSTER—RATIFICATION.

Where an insurance adjuster had prevailed upon his own and other insurance companies to refuse to write insurance for an individual, the act of such companies in complying with his request did not constitute a ratification of his unauthorized act, so as to make them liable therefor.

9. CONSPIRACY ⟨key⟩21—CIVIL RESPONSIBILITY —INSTRUCTIONS.

In an action against certain fire insurance companies for conspiracy in preventing plaintiff from obtaining insurance, instruction that defendants had the absolute right to cancel their policies, acting individually, and refuse to write others for plaintiff, but limiting such right to the individual action of the party exercising them, was erroneous, where, by special issue, the jury were required to find whether defendants or any of them formed a conspiracy to injure plaintiff in his business by any of the means alleged in plaintiff's petition.

10. TRIAL ⟨key⟩350(2)—SPECIAL ISSUES—REFERENCE TO PLEADINGS—ULTIMATE FACTS.

Submission of special issues to determine whether a conspiracy had been formed by defendants by any of the means alleged in plaintiff's petition is erroneous, where allegations of the petition, if true, standing alone, do not show wrongful conduct.

11. CONSPIRACY ⟨key⟩21—CIVIL RESPONSIBILITY—INSTRUCTIONS.

In an action against fire insurance companies for conspiring to prevent plaintiff from obtaining insurance, an instruction, requiring the jury to specifically find when and where the conspiracy was entered into, was properly refused, since it would imply the necessity of finding when and where a conspiracy was entered into before it could be found to have been formed.

12. CONSPIRACY ⟨key⟩21—INSTRUCTIONS—"PRIVILEGED COMMUNICATIONS."

In an action against fire insurance companies for conspiring to prevent plaintiff from obtaining insurance by reason of representations as to his character, it was error to refuse instruction that such representations made by an insurance agent to his company were conditionally privileged.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Privileged Communication.]

13. LIBEL AND SLANDER ⟨key⟩45(2)—CIVIL RESPONSIBILITY — "PRIVILEGED COMMUNICATIONS."

Communications passing between state agents of fire insurance companies and the local agents, and communications from one insurance company to another, with reference to matters wherein the companies are mutually interested, and to protect such interest, are conditionally privileged.

14. CONSPIRACY ⟨key⟩19—CIVIL RESPONSIBILITY—EVIDENCE—DAMAGES.

In an action against fire insurance companies for conspiring to prevent plaintiff from obtaining insurance, evidence held not to show total absence of damage.

15. APPEAL AND ERROR ⟨key⟩1050(1)—EVIDENCE ⟨key⟩471(35)—HARMLESS ERROR—CONCLUSION.

In an action against fire insurance companies for conspiring to prevent plaintiff from obtaining insurance, plaintiff's statement that he had been damaged was inadmissible as being a conclusion on a mixed question of law and fact, but was harmless because only made in connection with a statement of facts showing the way in which he had been damaged.

16. PARTNERSHIP ⟨key⟩54—EVIDENCE.

In an action against a fire insurance company and others for conspiring to prevent plain-

---

tiff from obtaining insurance, evidence *held* not to show that an adjustment company made defendant was a partnership.

**17. CONSPIRACY &copy;&rarr;18—CIVIL RESPONSIBILITY—PLEADING.**

In an action against fire insurance companies for conspiring to prevent plaintiff from obtaining insurance by slanderous communications made to the companies by their agents, the petition should be sufficiently specific to put defendants on notice as to what they would have to be prepared to meet on the trial.

**18. EVIDENCE &copy;&rarr;117—ADMISSIBILITY.**

In an action against fire insurance companies for conspiring to prevent plaintiff from obtaining insurance, the fact that one of defendant's witnesses had refused to answer on the ground of privilege was properly excluded, in the absence of a showing that defendants had suggested such refusal.

Appeal from District Court, Potter County; Hugh L. Umphres, Judge.

Action by John E. Griffin against the Palatine Insurance Company and others. Judgment for plaintiff, and defendants appeal. Reversed and remanded.

Thompson, Knight, Baker & Harris and George S. Wright, all of Dallas, Andrews, Streetman, Burns & Logue, of Houston, and T. F. Turner and A. S. Rollins, both of Amarillo, for appellants. Kimbrough, Underwood & Jackson, Madden, Trulove, Ryburn & Pipkin, Reeder & Reeder, and J. B. Dooley, all of Amarillo, for appellee.

BOYCE, J. Appellee, Griffin, brought this suit against appellants, the Palatine Insurance Company of London, the Commercial Union Fire Insurance Company of London, the American Central Insurance Company of St. Louis, Mo., the St. Paul Fire & Marine Insurance Company of St. Paul, Minn., the National Union Fire Insurance Company of Pennsylvania, and the Firemen's Fund Insurance Company of San Francisco, Cal.; being insurance companies holding policies of insurance on plaintiff's stock of groceries and fixtures used in connection therewith at the time of the fire hereinafter mentioned, and the individual defendants, Wm. P. Cassell, L. R. Cole, and E. W. Roberts, adjusters, representing said defendant insurance companies in the adjustment of said fire loss. Plaintiff alleged that following a partial destruction of his fixtures and stock of goods by fire on April 20, 1913, defendants Cassell and Cole, adjusters representing the defendant insurance companies in adjustment of the fire loss, entered into a conspiracy in behalf of themselves and their employers to bluff and coerce the plaintiff into a settlement and adjustment of his claim for loss on account of said fire at a much smaller amount than he was justly entitled to, and in order to carry out such plan threatened the plaintiff that if he did not settle "their way" he should never again have any insurance on his stock and fixtures; that plaintiff refused to accede to their demands, and thereafter said defendants, in order to carry out said threats, entered into a conspiracy to injure plaintiff in his business by means of false statements and imputations affecting his character and business, charging by innuendo that plaintiff had been guilty of the crime of arson in connection with the said fire; that in pursuance of such conspiracy defendant insurance companies canceled the policies of insurance held by them on plaintiff's said stock and fixtures, and by the means of such false and fraudulent statements, innuendoes, and communications to other insurance companies with whom plaintiff had secured insurance caused them also to cancel their policies, and also by such means caused all other insurance companies doing an insurance business at Amarillo to refuse to write any insurance on the property of plaintiff, thus organizing and maintaining against the plaintiff an insurance boycott; that plaintiff's business was greatly damaged by reason of his inability to secure insurance, and that on account of being without insurance he cannot purchase goods in large quantities on credit from the wholesale houses as he otherwise could have done, so that the volume of his business and profits on account of the lack of necessary stock is greatly reduced. The petition sets out at length numerous acts and statements alleged to have been done and made in pursuance and in accomplishment of the purposes of such conspiracy. These allegations, as well as such special features of the defendant's answer as will be necessary to notice, will be further referred to in the consideration of questions discussed later. A proper consideration of the case requires a rather full statement, and we will at this time outline the facts, and will later supply such details in statement as are necessary.

Griffin had a fire in his grocery store on the night of April 20, 1913, the origin of which was unknown. The defendant insurance companies had insurance policies on the stock and fixtures, which were damaged by this fire. The Bates Adjustment Company, which is alleged to be a partnership composed of the defendants L. R. Cole, E. W. Roberts, and others, the said Cole and Roberts being the only members of said organization served and answering, was engaged as an independent insurance adjuster, accepting employment as might be offered by insurance companies in the adjustment of claims, etc. The defendant insurance companies, except the National Union Fire Insurance Company, employed the said Bates Adjustment Company to represent them in the adjustment of the claim, resulting from the fire, the companies acting independently of each other in this employment; L. R. Cassell, the state agent for the defendant National Union Fire Insurance Company, represented it in the adjustment of said loss.

---

The adjusters Cole and Cassell, who resided in Dallas, met in Amarillo about April 23d for the purpose of proceeding with the adjustment of said fire loss. The evidence in support of the verdict justifies the conclusion that they took an arbitrary and unreasonable attitude in the negotiations for settlement, offering Griffin much less than he was entitled to in settlement, and informing him that if he did not settle their way he would never get any more insurance. The evidence is also sufficient to show that Cole might have held some ill will against Griffin on account of a disagreement over settlement of loss in a previous fire. Griffin declined to settle their way, and Cole, on April 28th, 29th, and 30th, reported by letter to the insurance companies employing him. His report, except that made to the Firemen's Fund Insurance Company, is in identical terms, and is as follows:

"Relative to claim under the above policies, we beg to advise that we visited Amarillo during the past week, but were unable to dispose of this loss. We found this assured, as he had been in previous fires, one of the most contentious men it has been our experience to deal with in adjustments of fire losses. The fire which damaged the property originated under rather suspicious circumstances, in the rear room of his store, about 4:30 on the morning of April 20th, starting in a pile of trash and sweepings, which had been the accumulation of a few days prior to the fire. On December 26, 1911, about 3 o'clock in the morning, this assured had a fire, which originated in practically the same place and manner as this one. On March 3, 1912, a fire originated in the drug store in the same building, but on the opposite side of a partition. At this time the writer was one of the adjusters of the loss, and finally succeeded in disposing of same by the payment of $150 alleged smoke damage, after the assured had stood out for some time on a claim of $1,500. The fire of December 26th, the insured had a sound value of stock, according to the appraisement of $16,000, while at this time the stock is about $7,000. The appraisers made an award of $2,-590 on the December fire, and in an effort to dispose of this claim we offered $1,900. You can see that on a stock of less than one-half the amount your offer is in excess of that awarded by the appraisers on the December, 1911, fire; the assured, however, was very arbitrary, taking the position that he is entitled to $5,000, and cannot possibly dispose of his stock at a loss of less than that amount. It is our opinion that he is desirous of going out of business and would like to have the insurance companies take the stock. This, however, we do not expect to consider, but will no doubt be forced to resort to appraisal to dispose of this claim. In the meantime, we would suggest that you take immediate steps to cancel your policies, subject to this claim, as we believe this man capable of taking most any action that might be of benefit to him financially. We will advise you as the matter develops, and trust our action in the end will be satisfactory.

"Yours very truly,
   "Bates Adjustment Co., by L. R. Cole."

His report to the Firemen's Fund Insurance Company is as follows:

"Re Loss Policy 22855, Amarillo, Texas Agency.

"Relative to claim under above number, we inclose proof executed by the Griffin Grocery Company, by J. E. Griffin, proprietor, in the sum of $39.95. If papers are found in order,

please forward draft in payment. The loss occurred about 4:30 on the morning of April 29th, originating in a pile of trash and sweepings in the rear room of the grocery store; the trash having been the gatherings from the floor of the near market of a few days prior to the fire. We believe the fire to have been accidental in its starting. In the adjustment of the claim on furniture and fixtures we found him reasonable, and had no trouble in disposing of the loss. We were, however, unable to agree upon the stock loss, and will no doubt be forced to appraise the same. This is the third fire this assured has had within the past fifteen or sixteen months— the first one originating approximately the same place and manner as this one. It occurred on the morning of December 26, 1911. On March 3, 1912, a fire originated in the drug store in the same building, occupied by the assured, and he made claim for smoke and water damage to his stock at that time, being very arbitrary in the settlement. He made a claim of $1,500 damage to stock at that time, which was finally settled by the writer and other adjusters for $150. His first fire was closed by appraisement. Practically all companies after the second claim refused to write further insurance for this man, and we have no doubt but that when this matter is disposed of he will be unable to procure insurance from any company. We give you this information in order that you may take action accordingly if you so desire," etc.

In a later report of June 3, 1913, to the American Central Insurance Company, and the St. Paul Fire Insurance Company, in which the adjustment finally made was reported, Cole repeats the information as to the origin of the fire, and states that:

"The fire chief of Amarillo believes that Griffin was instrumental in starting the fire. We are not thoroughly convinced, however, that this is true, but in the disposition of the claim we found Mr. Griffin very arbitrary."

The information as to the number of fires and difficulty in settlement is again repeated, and said letter contains this additional statement:

"We suggest that in the future you decline any insurance for this party on any sort of property. If he is honest as to the origin of fires he is certainly very unfortunate, and by reason of his being arbitrary in his settlement is an undesirable risk for any insurance company."

On receipt of the reports of April 28th to 30th, above referred to, the Palatine and the Commercial Union Companies, acting through R. D. Coughanour, state agent, and the Firemen's Fund, acting through C. C. Wright, state agent, immediately ordered the cancellation of their policies on the said stock and fixtures. The American Central Insurance Company and the St. Paul Fire & Marine Insurance Company, whose state agents were Cravens and Gage, of Houston, Tex., did not cancel their policies until settlement was finally made for the loss following the report of June 3d above referred to. Cassell, state agent for the National Union Fire Insurance Company on April 28th, ordered the cancellation of the insurance held by said company on Griffin's stock.

Cassell and Cole, representing their said companies, demanded an appraisal under the terms of the policy, and named a Mr. Cooper

as one of the appraisers. Pending the appraisement Griffin opened up business across the street from his old store, with a new stock of goods. In about ten days after the fire Cole was again in Amarillo and called on Griffin, and again told him that he had better settle, that if he got on the blue book he would never get off, insisting that the fire looked strange, and that Griffin was seeking to make money out of it, whereupon Griffin used some very abusive language toward him, and he left the store. A. S. Stinett was chosen by Griffin as one of the appraisers, and the two appraisers met at Amarillo on May 21st for the purpose of proceeding with such matter. At this time Cassell and Cole were again in Amarillo and made some observation to Stinett as to the frequency of Griffin's fires. In the adjustment following the work of the appraisers the insurance companies took Griffin's stock of goods, paying him $6,100, and sold this stock of goods to Lee Bivins for $3,000. During the negotiations with Bivins for this sale Cole and Cassell referred to the fact that they had had considerable trouble with Mr. Griffin, and there had been considerable fires, and asked Bivins if Griffin was going back into his building, it appearing that Griffin had been occupying under lease a portion of the Bivins building, and informed Bivins that if Griffin went into his building they would have to cancel the insurance on such building. Cassell also told Currie, a local insurance agent in Amarillo, some time pending the adjustment, that he was contemplating canceling all insurance policies on the Bivins building.

Griffin did move back into the Bivins building, and Cassell, state agent for the National, and Coughanour, state agent for the Palatine and the Commercial Union, directed the cancellation of their policies on the building and other occupants thereof. Later the local agent for the American Central Insurance Company wrote a policy on Griffin's stock, and Cravens & Gage, state agents, directed its cancellation by wire, following this by letter referring to the fact that the last loss by fire was very difficult to adjust, and stating that they preferred to discontinue writing insurance for Griffin. Some of the local agents in Amarillo, representing other companies, wrote insurance for Griffin, and these policies were later canceled on direction of the home office, and other insurance agents wrote their companies, requesting insurance for Griffin, and this was declined. These cancellations and declinations of insurance were made some of them without statement of any reason. One general agent stated, "Information which we have which is confidential is of such character that we would prefer to be without the line;" and another stated that it was on a prior loss and had Griffin on its avoidance list. One

communication from Dallas, dated May 22, 1913, gave as a reason "the position taken by Griffin in recent losses." Within a few months after the fire it became generally understood among the insurance agents at Amarillo that the companies would not write insurance for Griffin. No communications from any of the defendants among themselves, except as we have stated, or from them to any other insurance company, canceling or declining to write insurance for Griffin, was shown. It was shown, however, that many insurance companies, doing business in Texas, including all of the defendant companies, except the St. Paul and the American Central, have their general offices in what is known as the Insurance Building, in Dallas, in which the Bates Adjustment Company has its office, and that it is common for insurance men to swap information as to risks, losses, adjustments, and such matters, though the state agents representing the defendant companies deny having given any specific information as to the communications made to them by Cole, or having solicited other insurance companies not to write insurance for Griffin. It also appears that the local agents of insurance companies at Amarillo make daily reports to their companies, and that special agents for various companies doing business at Amarillo visit said place frequently, some of them as often as once each month; it being the duty of these special agents to gather information as to insurance risks, and report to their respective companies. It also appears that the mercantile agencies, such as Bradstreet and Dun, in their reports on mercantile firms, make mention of any fires suffered by such person, and how settled, by appraisement, etc.

It further appears that many companies, there being specific evidence as to 19, had canceled insurance or refused to write insurance for Griffin following the second fire referred to in the above letters of Cole. Some of these cancellations and instructions not to write gave no reason; others assigned the following reasons: "Special agent's report"; "Last loss we propose paying;" "Adjuster Miller's Report;" "Two losses and unsatisfactory adjustment;" "Special Agent Yesner desires cancellation;" "Assured unfortunate and thinks it better to give company benefit of the doubt;" "No mercantile rating and unfortunate as to fires in short space of time," etc.

There is testimony that justifies the conclusion that the statement as to the place of the origin of the fire as made in Cole's report is untrue, some of the witnesses giving it as their opinion that the fire must have started near the roof of the building. According to Griffin's testimony, the statement that he demanded $1,500 smoke damage from the fire originating in the drug store is also untrue; his testimony being to the effect

that when first called upon he stated that he thought his damage was from $300 to $500, but the adjustment was effected without difficulty.

The state agents of the defendant companies had entire control of the business of said companies in Texas, being the managers of such business within the state. The defendants offered evidence to the effect that in passing on the desirability of an insurance the previous fire record of the applicant for insurance and his attitude in settlement of previous losses is taken into consideration, that appraisal is seldom necessary in adjustments, and that a person with a record of three fire losses within a period of sixteen months and two appraisals in adjustment thereof would not be considered a desirable insurance risk.

All fire insurance policies provide that they are terminable at the option of the company, on five days' notice.

The jury found in response to special issues that all of the defendants entered into a conspiracy to injure the plaintiff in his business, and that he was injured thereby, awarding him $7,500 actual, and $5,000 exemplary, damages, and judgment was accordingly entered for the plaintiff against all of the defendants for said amount.

The record is very voluminous, and each of the appellants has briefed the case separately, each presenting some 90 assignments, though a great many of these are identical. It will be impossible to consider these assignments separately and in detail, and the case will be disposed of by a general discussion of the law and reference to particular assignments when necessary. A clear understanding of the cause of action on which the recovery was had will, we think, simplify the consideration of the case. The conspiracy to coerce plaintiff into a settlement by threats of loss of insurance was fruitless, and this fact is only material as tending to establish the further conspiracy to carry the threats into execution. Plaintiff's petition has much to say about a conspiracy to defame the plaintiff, as well as a conspiracy to injure him in his business, and the damages are alleged to be $20,000 as damages to plaintiff's good name, $10,000 damages to his business, and $10,000 damages to his credit. Exemplary damages are prayed for in addition to these items. The court only submitted the issue of damage to plaintiff's business, and appellee in his brief states that the suit is not an action for libel and slander, but "an action for malicious conspiracy to injure plaintiff in his business by wrongful and unlawful means." We may be a little more specific and say that the cause of action as developed on the trial was for a conspiracy to prevent plaintiff from securing insurance on his business.

[1] A definition of "conspiracy" very generally adopted is given in Commonwealth v. Hunt, 4 Metc. (Mass.) 111, 38 Am. Dec. 349, and quoted in R. C. L. vol. 5, p. 1061, as follows:

"A conspiracy must be a combination of two or more persons by some concerted action to accomplish some criminal or unlawful purpose or to accomplish some purpose not in itself criminal or unlawful by criminal or unlawful means."

The purpose of the conspiracy is to be ordinarily determined by the quality of the acts to be performed thereunder. Green v. Bennett, 110 S. W. 108. This may not, however, be always literally true where the acts to be done or withheld are themselves performed or withheld as an inducement to some other unlawful act. Toledo Ry. Co. v. Pennsylvania Co. (C. C.) 54 Fed. 737, 19 L. R. A. 387; Graham v. St. Charles Street Ry. Co., 47 La. Ann. 214, 16 South. 806, 27 L. R. A. 416, 49 Am. St. Rep. 366. The purpose of a conspiracy need not be necessarily to perform a criminal act, but the purpose is unlawful when it is proposed to wrongfully violate some right, either of the public or an individual. Bishop on Criminal Law, vol. 2, § 178; Commonwealth v. Hunt, supra. Many general statements may be found to the effect that a conspiracy to injure the business of another is a combination for unlawful purposes. Confusion will be avoided, however, if we are careful to remember in considering such general statements that "injury," as it is thus used means damage resulting from the wrongful violation of a legal right. W. Va. Transportation Co. v. Standard Oil Co., 50 W. Va. 611, 40 S. E. 591, 56 L. R. A. 807, 88 Am. St. Rep. 895; Macauley v. Tierney, 19 R. I. 255, 33 Atl. 1, 37 L. R. A. 459, 61 Am. St. Rep. 770; Doremus v. Hennessy, 176 Ill. 608, 52 N. E. 924, 54 N. E. 524, 43 L. R. A. 797, 802, 68 Am. St. Rep. 203; Brennan v. United Hatters, 73 N. J. Law, 729, 65 Atl. 165, 9 L. R. A. (N. S.) 261, 118 Am. St. Rep. 727, 9 Ann. Cas. 698. The wrongful violation of a right is the basis of all liability in cases of tort, so that when we come to determine whether the purpose of a combination is to injure another we must, before we can call the combination a conspiracy, ascertain the specific right that the combination proposes to wrongfully violate. We use the word "wrongfully" in this connection in view of the fact that most rights are only correlative; that is, are liable to overlap some right of another who would not be liable for its transgression if he violated it in the exercise of some right of his own of equal or superior dignity, in which case the violation is not wrongful and is said to be justified, and this is the basis of so much that has been said about "justification" in the law of conspiracy. The unlawful means used in the violation of a right which may make the violation of another's right wrongful, where it might otherwise be justified, may be properly considered in connection with the issue of justification in such cases. Civil liability in cases of conspiracy follows only in case of damages resulting from acts done under the conspiracy.

"The true test as to whether such action will lie is whether or not the act accomplished after the conspiracy has been formed is itself actionable. * * * And the first question to be determined is whether, on account of the acts charged by plaintiff against the defendants, he would have had a cause of action against either of them if no conspiracy had been charged. If he would have had, then he may maintain his action for a conspiracy. If he could not have sustained a separate action against either of the defendants on account of the matters complained of, the additional charge of conspiracy will not give it." Delz v. Winfree, 80 Tex. 400, 404, 16 S. W. 111, 112, 26 Am. St. Rep. 755.

We shall refer to this test again in the course of our opinion.

The first proposition, then, to be considered, is whether the purpose of the combination was to wrongfully violate any right of the plaintiff under the following circumstances: First, if the agreement was to control only the action of the parties forming the combination; second, if the agreement went further than this and included the influencing of others to a like action by means of false representations, etc. The manner of the submission of the case, as we shall later see, requires this separation of the proposition. The plaintiff had the right to pursue his business and employ the agencies necessary and usual in the conduct thereof, free from interference of others not acting in pursuance of some superior or equal right of their own. Contracts of insurance against fire are shown to be an important incident to the running of a mercantile business. They obviously enable one so engaged to trust his own capital and that of his creditors in such business more freely and are an important asset in determining the commercial credit to which such a business would be entitled. It has been long established that one inducing the breach of contract commits a wrong which is actionable. Raymond v. Yarrington, 96 Tex. 443, 72 S. W. 580, 73 S. W. 800, 62 L. R. A. 962, 97 Am. St. Rep. 914. But plaintiff in this case had no absolute contracts of insurance, since the policies were terminable at the option of the insurance companies. The companies therefore had an absolute right to cancel their insurance policies. They also had an absolute right to refuse to write insurance for Griffin, and this absolute right to cancel policies and refuse to write insurance would be a complete justification for such action, whether it proceeded from whim, caprice, or ill will. All other insurance companies likewise had the right to refuse to write insurance for plaintiff. For a long while, in the development of the law, it was debatable whether any action would lie for the interference in any but some right definitely fixed by contract; but right of freedom in seeking and obtaining such services as labor, insurance, etc., in the conduct of one's business, is as important as the preservation of such rights after they have been definitely acquired, and interference in the employment of such agencies may be just as harmful as disturbance thereof after they have been secured, and the result of the modern decisions is to give a right of action for interference in such matters where the interference is not the result of the exercise of some right of the other party. This right of freedom from interference is, of course, a relative one in the sense that it is likely to conflict with the rights of others in the exercise of a similar freedom when it becomes, of course, a question of whether the interference of the right on the one part is justified by the exercise of some right of the interferer.

[2] It is, however, definitely settled that one who, without justification of acting in the exercise of any right of his own, interferes with the freedom of another in his employment of the agencies of his business, is liable for the injuries resulting. Delz v. Winfree, supra; Brown v. American Freehold Mortgage Co., 97 Tex. 599, 80 S. W. 985, 67 L. R. A. 195; Hitchman Coal & Coke Co. v. Mitchell, 245 U. S. 229, 38 Sup. Ct. 78, 62 L. Ed. ——; Walker v. Cronin, 107 Mass. 563; Doremus v. Hennessey, 176 Ill. 608, 52 N. E. 924, 43 L. R. A. 800, 802, 68 Am. St. Rep. 203; Plant v. Woods, 176 Mass. 492, 57 N. E. 1011, 51 L. R. A. 343, 79 Am. St. Rep. 30; Passaic Paint Works v. Walker Dry Goods Co., 105 Fed. 163, 44 C. C. A. 426, 62 L. R. A. 673, where an extensive note on this subject may be found; Vegelahn v. Guntner, 167 Mass. 92, 44 N. E. 1077, 35 L. R. A. 726, 57 Am. St. Rep. 443; Brennan v. United Hatters, 73 N. J. Law, 729, 65 Atl. 165, 9 L. R. A. (N. S.) 261; R. C. L. vol. 5, p. 1090 et seq.; Corpus Juris, p. 581 et seq. The cases of Delz v. Winfree and Brown v. American Freeholder Mortgage Co., supra, are typical cases. In Delz v. Winfree it was alleged that defendants, without justification, combined to refuse to sell live animals for slaughter and slaughtered meat to plaintiff, who was a retail butcher, and to induce others to take similar action so that plaintiff could not secure the meat necessary to carry on his business, and it was held that this interference with plaintiff's business was wrongful and afforded a cause of action. The purpose of the conspiracy was unlawful because it was to violate, without justification, the plaintiff's right of freedom in purchasing meat necessary to carry on his business.

[3] In the case of Brown v. American Freehold Mortgage Co., supra, the plaintiff was a loan agent, who had been engaged in business for a number of years, having connections through which he could secure money to lend and having built up a large clientele of borrowers. The defendants entered such business, and for the purposes of securing the representation of a company for which plaintiffs were lending money and to prevent him securing the representation

of other companies, and to drive away his customers, circulated slanderous reports concerning plaintiff's financial standing and honesty; the purpose of the defendants being to secure the business for themselves. The effect of the decision is that, while the interest of the defendants as competitors would justify them in interfering with plaintiff's business and securing it for themselves by lawful means, such as reduction of interest rates, lawful solicitation, etc., this right did not justify the use of the unlawful means resorted to in the accomplishment of this purpose. Olive v. Van Patten, 7 Tex. Civ. App. 630, 25 S. W. 428; Grand Lodge, Order of Hermann Sons v. Schuetze, 36 Tex. Civ. App. 539, 83 S. W. 246; Wills v. Central Ice & Cold Storage Co., 39 Tex. Civ. App. 483; 88 S. W. 269; I. & G. N. Ry. Co. v. Greenwood, 2 Tex. Civ. App. 76, 21 S. W. 561; Green v. Bennett, 110 S. W. 108; Robison v. Texas Pine Land Co., 40 S. W. 843— are in harmony with the principles announced in the two Supreme Court cases. We conclude therefore that, if the purpose of the combination between the defendants included both elements of the proposition stated, it would be unlawful, and it remains to consider what would be the result if the combination extended only to an agreement among the defendants not to grant plaintiff insurance.

The Delz v. Winfree Case, supra, stresses the fact that the petition alleged not only that defendants refused to sell plaintiff meat (which the petition alleged was done by agreement), but that they induced others to refuse to do so; the inference from this and other statements in the opinion, some of which we have quoted, being 'that but for this additional fact no cause of action would be alleged. The absolute right of each of the defendants to refuse plaintiff insurance is a complete justification to each of such companies for such action, and, if the purpose of the combination contemplated only the doing of these things, such purpose was not to wrongfully violate any right of the plaintiff. The only theory under which it could be said that the purpose of a combination by agreement not to grant insurance is unlawful would be to regard the agreement of each company as an inducement to the others not to have such business relations with the plaintiff so that it might be said that each of the parties thus induced the other to take such action. In most of the cases where a liability is imposed by one interfering with a relative right of another by inducing some third person not to have business relations with him, the inducement or interference was accomplished by some means of pressure on the will of the other, such as threat to discharge or the offer or denial of the benefit of one's own business, etc. In the question we are considering, each defendant being aware of the facts,

with no coercion one of the other, or other inducement, voluntarily agree in concert to withdraw their insurance and refuse to write further insurance. We think the right of each defendant to regulate its own conduct, singly or in concert with others, so long as this is the only purpose of the combination, is sufficient justification for such an agreement.

It is true that Corpus Juris, vol. 12, p. 582 et seq., asserts that the weight of authority does not support the universal application of the rule for determining the lawfulness of the purpose of a combination, as stated in Delz v. Winfree, supra, and many cases are cited as announcing a contrary doctrine. An analysis, however, of these cases, does not disclose, we think, any real conflict with the principles stated in Delz v. Winfree, and followed by us. The cases cited in Corpus Juris and Ruling Case Law, as being contrary to this holding, fall practically under three classes: (1) Those in which the combination is made criminal by law; (2) where the combination proposes to regulate, not only its own conduct, but to interfere with the relations of others; (3) where the regulation of and the conduct of the combination was to be used as a means to induce an interference with some other right of the person to be affected by the combination—usually to secure an interference with his freedom of contract with others. We will discuss hereafter the first class of these cases; the second class has already been considered. Under the third class falls the cases of boycotts and sympathetic strikes. While the combination under consideration cannot be claimed to come under the third class, yet an examination of the cases under this class will disclose that the rule announced in Delz v. Winfree can be properly applied without importing any new doctrine that the combination gives a quality to an act and makes it unlawful when it would not otherwise be so. The true basis of the liability in such cases is stated, we think, by Judge Taft, in the case of Toledo, etc., Ry. Co. v. Pennsylvania Co. (C. C.) 54 Fed. 737, 19 L. R. A. 387, and is also clearly stated in the case of Graham v. St. Charles Street Ry. Co., 47 La. Ann. 214, 16 South. 806, 27 L. R. A. 416, 49 Am. St. Rep. 366. In the case last cited, it was held that a railway company, with power of employing and discharging a large number of employés, might exercise this power arbitrarily without liability as between it and any person discharged or seeking employment, yet, when this power was used with malicious intent to induce such employés or proposed employés to refuse to have business relations with plaintiff—a keeper of a boarding house—a liability resulted to the boarding house keeper. It was said that:

"In so doing the defendants would not only control their own will, action, and conduct, but forcibly control and change, from pure motives of malice, the choice and will of others, through

fear of nonemployment or discharge. This will and power of choice both the plaintiff and the parties themselves are entitled to have left free and not have coerced in order simply to work the former damage and injury."

This case enforced the liability in the absence of any conspiracy. Some of these cases cited refer to the power of the combination and seem to intimate that a different rule would apply to acts proceeding from it; but it is difficult to understand how the power referred to would create any liability unless it was exerted in violation of some right, and none of the cases have gone to the length of holding that there would be any liability except on this basis. Where the right violated is a relative one and justification is urged by the defendant, the combination may be important on the question of justification, as the combination may not always have the same justification as the individual and its pressure more coercive than that of the individual. Judge Taft, in the case of Toledo, etc., Ry. Co. v. Pennsylvania Co., supra, makes clear, we think, the point we are trying to make. In that case the railway engineers of several roads, having no grievance themselves against their employers, threatened to strike for the purpose of inducing their employers to refuse to handle the freight of another road, the complainant, on which the railway engineers were striking, and the principle announced in the case of Graham v. St. Charles Street Ry. Co., supra, was recognized. In the course of this opinion it is said:

"Ordinarily, the only difference between the civil liability for acts in pursuance of a conspiracy and for acts of the same character done by a single person is in the greater probability that such acts, when done by many in a combination, will cause injury. * * * If a single engineer, with intent to injure complainant, could, by threatening to quit or by actually quitting for the purpose, procure or induce the defendant company, in whose employ he is, to inflict a loss upon complainant by unlawfully refusing to interchange interstate freight, complainant could hold him liable for the loss. * * * The difficulty in supposing or stating any civil liability when the acts we have been discussing are done by a single engineer is in the improbability that either by singly refusing to handle the freight he could cause any injury to complainant, or by singly threatening to quit, or by quitting, he could procure his company to do so. But, when we suppose that all, or nearly all, the engineers on the eight different defendant companies combined with their chief to do these unlawful acts for the purpose of injuring the complainant, the intended loss becomes, not only probable, but inevitable."

We have been referred to no well-considered case which holds that the parties are liable for damages resulting from the doing by agreement those things which they individually had a right to do, where they would not be liable for doing the same thing individually and for the same purpose, and where the law does not make the combination criminal.

In the cases of Boutwell v. Marr, 71 Vt. 1, 42 Atl. 607, 43 L. R. A. 803, 76 Am. St. Rep. 746, and Martell v. White, 185 Mass. 255, 69 N. E. 1085, 64 L. R. A. 260, 102 Am. St. Rep.

341, it was held that, where an organization forces by heavy fine its members to refuse to have business with one falling under its ban, a liability exists; the fine being held to be a coercion against the unwilling members. These holdings themselves recognize that in the absence of the fine no liability would exist were the action taken as the result of voluntary agreement. In the case of Plant v. Woods, 176 Mass. 492, 57 N. E. 1011, 51 L. R. A. 339, 79 Am. St. Rep. 30, a leading case and one much relied upon by the appellee, the purpose of the combination was to interfere with the relations of others by a species of coercion with the purpose of forcing labor of a certain class to join the offending association, and the court, in the course of the opinion, said:

"The defendants might make such lawful rules as they please for the regulation of their own conduct, but they had no right to force other persons to join them."

In the case of Brown & Allen v. Jacobs Pharmacy Co., 115 Ga. 429, 41 S. E. 553, 57 L. R. A. 547, 90 Am. St. Rep. 126, also a leading case and relied on by appellee in support of the proposition we are considering, the purpose of the combination was, not only themselves to refuse business relations with the injured party, but to induce and force others to refuse to sell merchandise to him, and in the course of this opinion the court said:

"It may also be conceded, at least for the sake of the argument, that ordinarily a number of persons may, in concert, decline to sell or to buy from another. Yet the facts of the present case go much further than that. Here there was a combination, not merely agreeing to deal with the plaintiff, but undertaking also to drive off and prevent others from dealing with it, etc."

The purpose of the combination in the case of Klingels Pharmacy v. Sharpe & Dhome, 104 Md. 218, 64 Atl. 1029, 7 L. R. A. (N. S.) 977, 118 Am. St. Rep. 399, 9 Ann. Cas. 1184, was practically the same as that referred to in the case just discussed. In Carew v. Rutherford, 106 Mass. 1, 8 Am. Rep. 287, the purpose of the combination was to compel the payment by plaintiff of a sum of money "demanded of the plaintiff without right and not under any contract or agreement between him and the defendants." The purpose was to violate some right of the plaintiff, and therefore unlawful.

We do not consider it necessary to analyze the cases on this subject further, as they are numberless, and an attempt to do this would be an endless task. Mr. Cooley, in his work on Torts (volume 2, p. 603), states, we think, the correct conclusion on this question:

"As one person may refuse to have business relations with another, so two or more may combine or agree together not to deal with a particular person for any reason they see fit, and no action will lie, either to prevent the carrying out of this agreement, or for damages consequent upon its performance. But if the agreement includes the influencing of parties outside

the combination not to deal with the plaintiff, then it is illegal."

It was expressly held by the Supreme Court of Missouri, in the case of Hunt v. Simonds, 19 Mo. 583, that an action would not lie against the officers of insurance companies for combining to refuse to take insurance on a boat, however malicious their motive; and, while Corpus Juris classes this case as being modified or overruled by subsequent decision, we do not think the statement made by the writer of the text is justified by the decisions referred to as in support of the statement. The insistence of counsel for appellee on this point, and the fact that the case of Delz v. Winfree, supra, has been referred to as stating a doctrine not supported by the weight of authority, which statement, as we have tried to show, is not justified, is our "justification" for devoting so much space to the consideration of this question. It is a safe rule, we think, to leave to the Legislature the power of making unlawful a combination by agreement to do things which the individuals composing the combination have a right to do singly. Plaintiffs claim that the Legislature has made such a combination in this case criminal, and we will now proceed to discuss that proposition.

[4] If the agreement is criminal, it would be so only by reason of the provisions of the Act of 1903, pp. 119–123, which constitute articles 7796 to 7809 of the Revised Civil Statutes, and which also appear in the Criminal Code. Article 7796, composed of seven subdivisions, defines a "trust." Article 7797, composed of two subdivisions, defines a "monopoly," and article 7798, composed of two subdivisions, defines "conspiracies against trade." A general survey of these first three articles of the law discloses that it was evidently the intention of the Legislature by article 7796 to class as a trust those combinations which have for their purpose the exploitation of the public by suppression of competition, fixing and enhancement of prices, restriction of output, etc., following the general and popular conception of the idea of a trust. Article 7797 deals with the combination and consolidation of corporations forming a monopoly which could not possibly affect the question we have under consideration. Article 7798 deals with combinations and agreements as it affects the individual, rather than the public, and naturally it is to the provisions of this article that we would first look to find a prohibition of the agreement in question, which, if made, was aimed at the individual solely and would have no effect on the public. We will first, therefore, examine the provisions of said article 7798, Revised Statutes. The first subdivision of this article makes an agreement to refuse to buy from or sell to any other person, etc., "any article of merchandise, produce or commodity," a conspiracy. The second subdivision of the article makes it a conspiracy for any persons to agree to boycott or threaten to refuse to buy from or sell to any person, etc., for buying from or selling to any other person. In the case of Queen Insurance Co. v. State, 86 Tex. 250, 24 S. W. 397, 22 L. R. A. 483, it was held by the Supreme Court that insurance was not trade, traffic, commerce, or a commodity.

"Insurance is neither 'produced,' 'consumed,' 'manufactured,' 'transported,' nor 'sold,' in the ordinary signification of any of these words. * * * Insurance is a mere contract of indemnity against a contingent loss. Though it is an * * * aid to commerce, it is not a business of commerce, or one in which the public have any direct right."

The Supreme Court in that case was considering the act of the Legislature prior to the act under consideration, and it was there held that insurance did not fall within any of the terms of said statute which referred to restrictions in trade or buying, selling, and limiting the output of any article or commodity. It is therefore apparent that the agreement in question does not fall within the provisions of article 7798, Revised Statutes, and if it is inhibited we must find the inhibition under the provisions of article 7796. The first subdivision of this article is a general provision which we will consider hereafter, and which is followed by a number of specifications, and which fall under three general classifications: First, limitation of production; second, prevention of competition; and, third, fixing and maintaining prices—all of which are injurious to the public.

[5] Insurance is specifically mentioned in the second, third, fourth, fifth, and sixth subdivisions of this article. It obviously does not come within the provisions of the second and fourth subdivisions, but appellee claims that it does fall within the provisions of the fifth and sixth. Subdivision 5, so far as it applies to this question, makes illegal a combination or agreement "to preclude a free and unrestricted competition among themselves or others in the * * * business of * * * insurance." Subdivision 3 also makes unlawful a combination whose purpose is to prevent or lessen competition in the business of insurance or in aids to commerce. Subdivision 6 of the act makes unlawful a combination to regulate "the amount of insurance which may be undertaken." "Competition" is a mutual striving for the same object and involves the idea that the object sought is desired by each of the competitors. Competition is advantageous to the public not connected with such business but dealing with it, because it tends to afford better service at less expense, etc.

When we remember the general purpose of this article of the statute, it would only be in a distorted sense, we think, that the provisions above quoted would apply to the agreement we are considering. Subdivision 1 of this article classes as a trust any combination "to create, or which may tend to

create, or carry out restrictions in trade or commerce, or aids to commerce, or in the preparation of any product for market or transportation, or to create or carry out restrictions in the free pursuit of any business authorized or permitted by the laws of this state." The statute which the court was construing in the case of Queen Insurance Co. v. State, supra, did not contain the words "aids to commerce," nor anywhere specifically refer to insurance, and the Legislature evidently had in mind the decision referred to, holding that insurance is an aid to commerce, when this provision was inserted in this subdivision of the act. It is possible that the agreement under consideration might come within the broad provisions of this section. It has, however, been pointed out by the Supreme Court, in the Queen Insurance Co. Case, that, if subdivision 1 of the act was to be broadly construed, there would have been no necessity for any subsequent particularization, and it was there held that the words in said first subdivision of the act then under consideration, which corresponds in general to the provisions of the first subdivision of the act which we are now considering, "were intended only as a general expression of the purpose of the law, and that the acts defined in the subsequent members of the section were intended as a specific definition of what was meant in the first." We think this language is as applicable to the construction of the present law as it was in the construction of the old. Considering the act as a whole, and the classification of the subject which the Legislature was attempting to make, it is significant that no reference to insurance was made in the provision of article 7798, the article devoted to combinations as it affected the individual. The court had held in State v. Insurance Co., supra, that "forced insurance for obvious reasons is detrimental to the public interest," and, as we have already shown, the Legislature evidently had this decision in mind when the present act was adopted. The omission of such reference in said article 7798 appears to be deliberate, and under these circumstances the construction of the provisions of article 7796 should not be enlarged to include in its general terms a subject not intended to be treated thereunder, and we hold that the act does not apply to this case. The Queen Insurance Co. Case, supra, is also authority for the proposition that such an agreement would not be criminal under the common law.

The importance of the fact of conspiracy, therefore, is only in the effect it has on the liability of one of the parties to it for the acts of others, and the admission of evidence; it is also said to be an aggravation of the unlawful act by the individual.

The facts we have stated, viewed through the verdict of the jury, justify the conclusion that Cole and Cassell, when their threats against Griffin failed, conspired to put these threats into execution. This being accomplished by Cassell controlling the actions of his own company, of which he was state agent, and of which he had control, and by Cole inducing similar action by the companies represented by him through false statements and innuendoes made in his reports to them. A conclusion that any one of the defendant companies thereafter actively sought or induced other insurance companies to refuse business to Griffin would be a mere surmise. The fact that the insurance companies having business with Griffin at the time of the third fire loss refused to write him further, that trouble was had in the adjustment and that they entertained doubts as to his honesty, in connection with the facts as to the previous fire losses, and that one of those losses was also adjusted by appraisement, and that many companies, prior to the third fire loss, were refusing to write insurance for Griffin, when made known to an insurance company not having had previous business with him, would be a sufficient explanation of the refusal of such a company to grant him insurance. The record shows that the insurance companies had many means of acquiring information of this character through the custom of swapping information, reports of the mercantile agents, reports of their local agents and of their special agents, whose special duty it was to gather and report such facts. So that the acts and communications of Cole and Cassell in the adjustment of the third fire loss is the only definite, and we think is a sufficient, source of the general information that thereafter became prevalent in the insurance world, that Griffin was a bad insurance risk. Cole and Cassell and Cassell's company, the National Fire Insurance Company, would therefore be liable for this result if brought about through their wrongful acts, and the liability of the other defendants would depend on a determination of the question as to how far they would be liable for Cole's acts.

The authority of the adjuster Cole to bind the insurance companies which he represented by an agreement to enter into such a conspiracy as is the basis of this cause of action is raised by several assignments urged by appellant. Cole was not a regular employé of the defendants, but an independent adjuster, employed by such defendants to act for them in the adjustment of this particular fire claim. His duties were to adjust the claim and report the facts. He had no authority to write insurance for said companies, to cancel their policies, or to control in any way, except as 'his report of the facts might influence such action, the conduct of the companies in writing or refusing insurance. As we have already seen, the real purpose of the conspiracy was to prevent Griffin from securing insurance, which involved the control of the action of the companies themselves in that regard, and inducement of others to pursue a similar action.

[6] A conspiracy makes the individual parties to it liable, not only for their own individual acts, but for the acts of others done in the accomplishment of its purpose. The basis of the conspiracy, in order to thus bind the combination jointly, lies in mutual agreement. This need not be express, but may be implied. But, after all, there must be a conscious assent, express or implied, to the association to accomplish the common purpose resulting in a kind of partnership. Corpus Juris, vol. 12, pp. 543, 544; R. C. L. vol. 5, p. 1065; Hitchman Coal & Coke Co. v. Mitchell, 245 U. S. 229, 38 Sup. Ct. 72, 62 L. Ed. ——.

[7] The question then resolves itself thus: Could Cole, who had no authority himself to cancel or write insurance or control the actions of his principals in such matters in the future, bind them by a conspiracy agreement which contemplated such action on their part? The general test announced by the authorities for determining whether the master is liable for a particular tort of his servant is whether such tort was committed while the servant was acting within the scope of his employment. I. & G. N. Ry. Co. v. Anderson, 82 Tex. 516, 17 S. W. 1039, 27 Am. St. Rep. 902; I. & G. N. Ry. Co. v. Cooper, 88 Tex. 607, 32 S. W. 517; Branch v. I. & G. N. Ry. Co., 92 Tex. 288, 47 S. W. 974, 71 Am. St. Rep. 844; Medlin Milling Co. v. Boutwell, 104 Tex. 87, 133 S. W. 1042, 34 L. R. A. (N. S.) 109; H. & T. C. Ry. Co. v. Bush, 104 Tex. 26, 133 S. W. 245, 32 L. R. A. (N. S.) 1201; Acme Laundry Co. v. Weinstein, 182 S. W. 411, and collection of authorities; Hill v. Staats, 187 S. W. 1039, and collection of authorities; Mechem on Agency (2d Ed.) §§ 1875–1879; R. C. L. vol. 18, pp. 793–797; La Batte on Master and Servant (2d Ed.) §§ 2226, 2274–2279. Only a cursory examination of the authorities is necessary to realize that the application of the general test announced is not an easy matter. It is our purpose, however, to refer to but a few authorities which we think will enable us to reach a conclusion as to the particular question under consideration. In the case of I. & G. N. Ry. Co. v. Anderson, 82 Tex. 516, 17 S. W. 1040, 27 Am. St. Rep. 902, a case by the Supreme Court, and followed by numerous decisions since, it was held that, although a brakeman in defendant's employ negligently ejected a trespasser while he was on a car in a train on which the brakeman was serving at the time, the liability of the defendant would depend on whether the ejection of the trespasser from the train was within the general scope of the duties of the brakeman. The court said:

"Where a recovery is sought of the master for an injury inflicted by his servant, the plaintiff must show that the servant did the wrong while acting within the scope of his employment. * * * To hold the master liable for the act of his servant, it is not necessary that the servant should have authority to do the particular act. The act of the servant may be contrary to his express orders, and yet the master may be liable, but yet the act must be done within the scope of the general authority of the servant. It must be done in furtherance of the master's business, and for the accomplishment of the object for which the servant is employed. For the mode in which the servant performs the duty he is engaged to perform, if wrongful, and to the injury of another, the master is liable, although he may have expressly forbidden the particular act, but whether the act in question can be implied from the general authority conferred upon the servant must, in general, depend upon the nature of the service he is engaged to perform, and the circumstance of the particular case."

An enlightening discussion of the subject will be found in the citation to Mechem, and the conclusion reached by that author is thus stated:

"This term 'course of employment' is largely a question of fact, and its determination may vary in each case in view of the particular circumstances. The utmost that can ordinarily be said is that a servant is acting within the course of his employment when he is engaged in doing for his master either the act consciously and specifically directed or any act which can fairly and reasonably be deemed to be an ordinary and natural incident or attribute of that act, or a natural, direct, and logical result of it." 2 Mechem, § 1879.

In this case the threats against Griffin to force him to settle proved abortive. The making good thereof could in no way help or further the adjustment or benefit the insurance companies. If Cole himself had no authority to write insurance or cancel the policies, how could he bind his company by an agreement that these things should be done? In making such an agreement he forsook his own line of duties and entered a province of the business and sought to control the action of his principal therein with which he had no connection. His agreement to enter into a conspiracy which contemplated the doing of these things was therefore, we think, without the scope of his employment and would not bind his principals unless ratified.

[8] The fact that the insurance companies did the things contemplated by him, canceling their policies and refusing to write further insurance for Griffin, does not prove ratification as appellee seems to think; those acts cannot properly be attributable to a conscious entry into the conspiracy, but are the direct and natural consequence of the false report of Cole to the companies; each of the defendants represented by Cole thus becomes the "induced," rather than a participant in the wrong of inducing others not to insure plaintiff. The managing officers of two of the defendants were at Houston, and the record affords no evidence that those companies had any opportunity of knowing that the report of Cole did not state the true facts, but was a part of a conspiracy against plaintiff, and we do not think that the fact that Cole officed in the same building with Cassell and the state agents of the other defendants in Dallas would be sufficient to afford a basis for a finding that such defendants had knowledge of Cole's bad faith. There is

therefore, we think, no sufficient evidence that those defendants represented by Cole entered into the conspiracy charged. The court refused to give any charge on the question of Cole's agency, or to submit any issue as to the knowledge of such defendants as to the conspiracy, and if there was any evidence as to such knowledge or ratification, this action on the part of the court would be error. This holding is not in conflict, we believe, with the case of Southwestern Tel. & Tel. Co. v. Long, 183 S. W. 426, which was a suit against a corporation for a slander committed by its agent while performing, and as incident to, a service which was a part of his duties. We may admit that the defendants might be liable for slanderous statements made by Cole while engaged in and incident to the matter of adjusting the claim, for instance, in the communications made to Stinnett; but, as appellant has himself shown, the cause of action is not for the slander, which was only the means to the ultimate wrong that was intended to be perpetrated. Brown v. Mortgage Co., supra.

[9] The court instructed the jury to the effect that the defendants had the absolute right to cancel their own policies of insurance, "acting individually," and refuse to write others for plaintiff, and that no liability would result from such acts, even though done simultaneously with that of other companies. This statement, however, was immediately followed by this instruction: "These rights, however, are limited to the individual action of the party exercising them." By special issue No. 1, the court required the jury to find whether the defendants, or any of them, formed a conspiracy to injure plaintiff in his business by "any of the means alleged in plaintiff's petition." If we are correct in the conclusions as to the law already announced, the limitation on the right of the defendants, as above quoted, was error. It left the impression that an understanding among the defendants not to write insurance would be unlawful, and the jury could have based its finding of conspiracy on a finding of this fact alone. In the same issue that submitted the question of conspiracy, the jury was required to name the defendants entering such conspiracy, and in answer to this issue all of the appellants herein were named. By special issue No. 5, the court required the jury to find whether any of the defendants communicated to any other insurance company not a defendant, falsely and maliciously, acts and statements alleged by plaintiff in his petition, and the jury found that such communications were so made and that they influenced the action of other insurance companies in refusing to carry insurance for plaintiff. This finding, if supported by the evidence, would not render harmless the error in the charge, because there would be no conspiracy if the agreement extended no further than to the agree-

202 S.W.—65

ment among themselves not to further insure the plaintiff. If this was the basis of the finding of conspiracy, the acts of some of the defendants in inducing other insurance companies not to insure the plaintiff would not be chargeable to those defendants not participating in such action. This matter was called to the court's attention by the objections to the charge and special instructions.

[10] This same objection is suggested in assignments relating to the manner of submitting the issues, including issue No. 1, above referred to. The court in submitting said issue, as well as successive issues, referred the jury to the petition in aid of the charge as above shown. The objection is that a number of the allegations of fact in the petition, even if true, standing alone would not be wrongful. This manner of referring to the petition in the charge has been the subject of frequent criticism. Bering Mfg. Co. v. Femelat, 35 Tex. Civ. App. 36, 79 S. W. 872; T. & N. O. Ry. Co. v. Mortensen, 27 Tex. Civ. App. 106, 66 S. W. 101; T. & P. Ry. Co. v. Tankersly, 63 Tex. 60; Stand. Enc. Pldg. vol. 13, p. 782. The petition in this case consists of 40 separate paragraphs, and sets out in detail numerous acts alleged to have been done in the formation of and in pursuance to the conspiracy, and such general reference to the petition under such circumstances is particularly apt to be confusing to the jury. We do not mean to say that an issue should be submitted on each fact alleged or proved; it is improper to submit issues as to evidential facts. The ultimate fact is alone to be submitted; for instance, whether the defendants conspired to prevent plaintiff from securing insurance on his business by the circulation of false and slanderous statements and innuendoes concerning him. We are not prepared to say that the case would be reversed on this character of error in the charge alone, as some of the cases hold that before such an error would require a reversal specific and correct instructions should be requested by the appellant. St. Louis & S. W. Ry. Co. v. Harrison, 73 S. W. 39.

[11] The issue requested by the appellants on conspiracy was not proper, in that it required the jury to find specifically when and where the conspiracy was entered into. Such a requirement in connection with the issue of conspiracy would tend to impress upon the jury that before it could find that a conspiracy existed it must be definitely shown when and where it was entered into.

[12] The appellants requested the court to charge the jury that the reports of Cole to the insurance companies represented by him, were privileged, if made to such companies for the purpose of protecting their interests and in the discharge of his own duties, and the statements contained therein were made

in good faith and upon the belief on reasonable grounds that they were true, and statements made under such circumstances would not be unlawful though in fact untrue. We think this instruction should have been given. There can be no doubt that such communications are to be classed as conditionally privileged. Schulze v. Jalonick, 18 Tex. Civ. App. 296, 44 S. W. 580; Mo. Pac. Ry. Co. v. Richmond, 73 Tex. 568, 11 S. W. 557, 4 L. R. A. 280, 15 Am. St. Rep. 794; G., C. & S. F. Ry. Co. v. Floore, 42 S. W. 611; Cranfill v. Hayden, 97 Tex. 544, 80 S. W. 614. Which means that the inference of malice ordinarily to be drawn from the mere publication of false statements of a slanderous nature will not obtain from the mere showing of the fact of such communications if they are conditionally privileged. Appellee's only answer to this proposition is that the suit was not for slander or libel. True, but, however we regard the matter, an understanding of defendants' rights is essential to a determination of whether they wrongfully violated any right of the plaintiff. An unlawful purpose may not, under the circumstances, be deduced from the mere fact of these communications. This would be otherwise if the communications were not privileged. These communications are the unlawful means upon which plaintiff relied largely to establish his case. Defendants had the right to have this instruction given in order to enable the jury to properly determine whether these means were unlawful. The court did not submit the question of conspiracy in exactly the way we have discussed it, but the effect of the charge was the same. The jury were told that a malicious conspiracy was unlawful, and that "any unlawful act done willfully and purposely to the injury of another is as against that person malicious." This was the correct conception of malice in its application to this phase of the law. Brennan v. United Hatters, 73 N. J. Law, 729, 65 Atl. 165, 9 L. R. A. (N. S.) 261; London v. Horn, 206 Ill. 493, 69 N. E. 526, 99 Am. St. Rep. 185.

[13] The court required the jury to find whether the conspiracy was malicious, and whether the acts and communications charged against the defendants were malicious. So that under this manner of the submission of the question the instruction would have been appropriate in the determination of the question of malice. Communications passing between the state agents of the defendants and their local agents at Amarillo, and any communications from one insurance company to another, made with reference to matters in which such companies were mutually interested, and for the purpose of protecting such interest, would be for the same reasons conditionally privileged.

[14, 15] Appellants by various assignments assert that there is no evidence of any damage sustained by plaintiff. The testimony on the question of damages is devoted largely to showing that plaintiff, on account of having no insurance bought in smaller quantities, ran his business with a much smaller stock and the volume thereof was greatly reduced, resulting in a corresponding reduction of his profits. Lack of insurance, of course, might deter the plaintiff from risking his own or borrowed capital in the business, and prevent him from handling it as it would be otherwise handled. It is also obvious that it would have an effect on the credit of the business. As insurance is thus an important aid in business, the law would certainly allow damages to one wrongfully deprived of its benefit. We are not prepared to say that the evidence shows no damages at all, and overrule these assignments. A large part of the evidence on damages is devoted to a showing that on account of the lack of credit resulting from plaintiff not having insurance he could not buy as he had done before, and appellants' brief on this point is largely devoted to an attempt to show that this statement is not true, and shows by reference to plaintiff's books that his actual indebtedness to the firms with which he was dealing was larger after the fire than it had been at any time for a period of two years prior thereto. This might be true, and yet it would not necessarily follow that his buying capacity had not been limited. It might not have been necessary to use the limit of his credit before the fire to enable him to carry the stock he thought proper, while, according to plaintiff's testimony, he was limited after the fire, and his testimony is positive that his stock was greatly reduced.

While the question is not raised by assignment, and the parties treat the loss of credit as being an element of actual damage, we suggest that there may be some doubt whether under our decisions loss of credit is an element of actual damage in such cases. Trawick v. Martin-Brown Co., 79 Tex. 460, 14 S. W. 565; Curlee v. Rose, 27 Tex. Civ. App. 259, 65 S. W. 197; Malin & Browder v. McCutcheon, 33 Tex. Civ. App. 387, 76 S. W. 587. We do not decide the question, as it is not briefed, but make the suggestion in view of another trial so that an investigation of the law thereon may be made and properly presented. The general statement by Griffin that he had been damaged was inadmissible, as being a conclusion on a mixed question of law and fact. However, its admission was harmless, because it was only made in connection with a statement of the facts showing the way in which he had been damaged.

The evidence would be sufficient to authorize a finding by the jury that the failure of Griffin to secure insurance was the result of his fire record, and would have been the result, independent of any wrongful acts of the defendant. If a proper instruction or issue had been presented on this subject, it

might have been the duty of the court to have given it. The issue requested by appellants was properly refused, because its effect, by reciting certain facts in connection with its submission, gave undue prominence to the consideration of these facts in the determination of the answer to the issue.

[16] Plaintiff alleged that the Bates Adjustment Company was a partnership, composed of the defendants L. R. Cole, E. W. Roberts, E. P. Bates, and others not necessary to mention, only Cole and Roberts being served. Roberts denied the partnership under oath. The only evidence introduced on the question of partnership was the letter head used by the Bates Adjustment Company, and the testimony of Cole. The letter head referred to had "The Bates Adjustment Company" printed in large type across the top of the letter head, and the words, "Insurance Adjusters" directly under this. In smaller type, just above the printing "The Bates Adjustment Company," were the names of E. P. Bates, L. R. Cole, E. W. Roberts, and other defendants alleged to compose the partnership. Cole testified that the Bates Adjustment Company was owned by E. P. Bates, and that he and Roberts and the other adjusters worked for Bates on a weekly salary. Cole, in his testimony, referred occasionally to the Bates Adjustment Company as "our firm." The burden of proof of partnership was on the plaintiff, and we do not think the evidence sufficient to discharge this burden. The letter head does not necessarily indicate a partnership. The relation of the names printed thereon to the Bates Adjustment Company might be that of partners or mere employés. The Bates Adjustment Company might be a partnership, a corporation, or the trade-name of an individual. There was no evidence connecting the defendant Roberts in any other way with plaintiff's cause of action, and we conclude that the evidence is insufficient to hold him liable.

The evidence, the admission of which is complained of from the seventy-sixth to eighty-eighth assignment, was, we think, admissible as showing the effect and purpose of the conspiracy and exhibiting acts done in pursuance to it. If the evidence is insufficient to show any particular defendant not to be a party to the conspiracy, such defendant would not be liable for such acts in which he did not participate. The acts of third persons not parties to the conspiracy, or not having any knowledge of it, would be admissible when it reasonably appears that there is any connection between such acts and the conduct of the conspirators, for they may make third persons innocent tools to work their unlawful purpose.

[17] While we do not think it would be necessary for the plaintiff to state in minute detail slanderous statements which he proposed to offer in evidence in support of a cause of action of this character in the same manner as would be necessary in a libel and slander suit, still we are inclined to think that the pleading as to the nature of the communications and persons to whom made should be sufficiently specific to put the defendant on notice as to what he would have to be prepared to meet on the trial. It does not, however, appear probable that defendants in the trial were taken by surprise by any of the proof offered; in fact, most of the evidence was confined to the specific allegations, so that we would not reverse the case on account of the action of the court in overruling exceptions to the general allegations of the petition.

[18] We have considered appellants' cross-assignment to the action of the court in excluding the answers of the witness Phingstag refusing to answer as to the source of his "confidential information," pleading that it was privileged. The purpose of this testimony was to show by inference that the defendants had procured the suppression of this testimony. If there had been any showing in any way that the defendants, or their counsel, had suggested that the witness pleaded the fact of privilege and refused to answer the interrogatories, the fact of his refusal would have been admissible, but in the absence of such showing we think the action of the court in sustaining the objections was correct.

We believe all the questions suggested in appellants' briefs may be determined by the application of the principles discussed in connection with well-known rules of law. Those assignments which present questions not discussed are overruled.

Reversed and remanded.

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes